McKINNEY, Respondent, v. NORTHCUTT et al., Appellants.

St. Louis Court of Appeals, October 2, 1905.

1. **EQUITY: Finding of Fact.**   The appellate court will defer somewhat to the finding of facts by the chancellor on a trial, and where all the evidence is not incorporated in the record, the appellate court will decline to review the facts.

2. **NAVIGABLE STREAMS.**   In this country, streams which are capable of being used by the public for purposes of commerce, no matter in what mode the commerce may be conducted, are navigable in fact, and in law are public highways.

3. ————: **Continuous Use: Obstructing Waterway.**   A stream which may be used for the transportation of rafts of railroad ties for several months during the year without the aid of men from the banks, is navigable and the rights of riparian owners are subject to the easement in the public; an injunction will lie, on the part of one floating ties to market on such stream, to restrain a riparian owner from obstructing the   stream.

4. ————: **Question of Fact.**   Whether a stream used for rafting products of the forest above the point where government surveys terminate is navigable and a public highway for commerce is a question of fact and a finding to that effect by the chancellor, in a proceeding to enjoin the obstruction of such a stream, supported by substantial evidence, where all the facts are not before the appellate court, will not be disturbed.

5. **PLEADING: Sufficiency of .Petition:   Objection   to   Evidence.** Objection to the introduction of evidence on the ground that the petition is insufficient, will not be sustained if the petition would be good after verdict; that is, unless it wholly fails to state a cause of action.

6. ————: ————: **Demurrer.**   Although a petition may be held defective on demurrer for failing to state some material matter, if such matter is necessarily implied from what is stated, the defect is cured by verdict.

Appeal from Washington Circuit Court.—*Hon. F. R. Dearing,* Judge.

AFFIRMED.

*Dinning & Hamel* and *Ed. T. Eversole* for appellants.

*James Booth* for respondent.

It has long been the rule of the common law, that streams which in their natural condition, at ordinary stages of water, are fit and capable of being used for rafting purposes; that is to say, rafting railroad ties down the same, are public highways for that purpose, that the owner owns to the thread of the stream or the whole of it as the case may be, subject to the right of the public to use it for that purpose. As to whether or not Indian creek was such a stream, was a question of fact, upon which there was evidence for and against, and the trial court decided that issue against appellant; and without regard to whether this action be denominated legal or equitable this court will defer to the finding of the court below. Benne v. Schnecko, 100 Mo. 250, 113 S. W. 82; Howe v. Ins. Co., 75 Mo. App. 63. At the trial below, appellant did not demur to the petition but answered it raising a question of fact and the only question that can now be raised would be the sufficiency of the petition to support the judgment; and the claim that the petition is insufficient for such a purpose is not here made.

### STATEMENT.

Plaintiff is a tie contractor. He buys timber and employs men to work it into railroad cross and switch ties, which ties are made into rafts and floated down Indian creek in Washington and Franklin counties to the Meramec river and thence down the Meramec to market. This suit is a proceeding by injunction. The bill alleges in substance the facts above stated and that the four defendants own severally four farms through which said Indian creek flows; that at all times, especially in

March, April, May and June of each year, said creek, in its natural state and condition, is fit, useful and capable of being used for rafting railroad cross and switch ties; that while the plaintiff was prosecuting his business of rafting, etc., the four defendants wrongfully agreed and conspired together for the purpose of wrongfully extorting money from the plaintiff; that is, defendants wrongfully entered into an agreement among themselves not to allow the plaintiff to raft his said ties down stream where it passes through the several farms owned by defendants unless plaintiff first compensated defendants for the privilege of so doing; that in furtherance of said conspiracy, the defendants cut and felled a large number of trees into the said creek on their respective farms, at a point where plaintiff was compelled to pass with his said rafts, and thus prevented his use of said stream without first removing said felled timber from the waterway; that defendants forbade plaintiff, his servants and agents, from so removing said timber and threatened to cause the arrest of plaintiff and his servants or any of them if they attempted to remove said felled timber from said creek; that on April 26, 1903, while plaintiff by his servants and agents was floating a raft of 441 ties down said creek to Pacific, Missouri, the same was caused to halt by defendant, S. P. Northcutt, where said creek crossed his farm, said Northcutt acting in furtherance of said conspiracy, forbidding said raft to be floated through his lands and that said Northcutt threatened to cause the arrest of plaintiff's agents if they proceeded further therewith; that there was no other route by which said raft could be conveyed to its destination and that because of said threats and interference, plaintiff was compelled to abandon said raft for the time being, and the same was allowed to remain in said creek, whereby the ties therein became water-soaked and damaged; that plaintiff then had 7,000 ties prepared for market and to raft down said stream, but was and is prevented from so doing because of said wrongful acts of

the defendants, whereby plaintiff alleges he is damaged in the sum of $250, and that said wrongful acts of defendants prevented plaintiff from carrying on his said lawful business and threatened a multiplicity of suits at law which will harass the parties and not determine the issue, to-wit, the right of rafting in said stream. Wherefore plaintiff prays that defendants be restrained in that behalf, etc., from further interference with plaintiff's said business of rafting his ties to market.

The petition was duly filed in the office of the circuit clerk of Washington county, and thereupon an application was made to the probate judge of said county, as is provided by sections 3627 and 3628, Revised Statutes 1899, for a temporary restraining order against defendants, upon a showing being made to said probate judge, as required by the statutes, supra, that there was not then any circuit court in session or any judge thereof then in Washington county. The probate judge issued a temporary writ of injunction in accordance with the prayer of the bill, returnable to the next term of the circuit court of said county. The cause coming on to be heard, in the circuit court, defendants appeared and filed their motion to dissolve the injunction, which motion is not included in the bill of exceptions before us. An answer was also filed by the defendants in which they alleged that they had no interest in common in the land through which said creek passes, but admitted their several ownerships of the several farms mentioned in the petition and denied every other allegation of the bill.

The case was tried to a court without the intervention of a jury. Defendants entered their objection to the introduction of any evidence under the petition on the ground that it failed to state facts sufficient to constitute a cause of action, which objection was overruled and exception saved.

From the record before us, it appears that the issue between the parties and that tried by the court below was whether or not Indian creek is a stream fit, useful

and capable for rafting purposes. Evidence pro and con was introduced on this issue by the respective parties, at the conclusion of which the court took the matter under advisement until the following term, when it found the issue for the plaintiff.

The evidence on the part of plaintiff tended to prove that plaintiff was a tie contractor and had been in the business for a number of years in the vicinity of Indian creek; that said creek was a tributary to the Meramec river, and the Meramec river is tributary to the Mississippi river; that for seven years past plaintiff had floated ties down said creek in large quantities from points below the scene of the present controversy. A raft usually consists of about 600 ties. At this time plaintiff had 7,000 ties along the creek above defendant's farm ready for floating; that said creek in its natural state is from thirty-two to forty-eight feet wide and its depth in the most shallow places is from twelve to fourteen inches, and in other places its depth is about fifteen feet, and in its usual and natural condition, it is fit, capable and useful for rafting; that it was a tortuous mountain stream, and in the months of April, May and June, as well as in some of the autumn months, was usually well supplied with water from its mountain sources. The ties are six inches in diameter and eight inches in width; that rafts are constructed by placing twenty to thirty ties in a block, the rafts thus made being six inches thick and about eight feet wide and the several blocks are coupled together and follow others down the stream; that a floating tie draws about four and one-half inches of water and said rafts were floated in said creek and over the shoals thereof with the raftsmen thereon and without their going upon the land in aid thereof; that as plaintiff's men were progressing down the creek with the raft of 441 ties, at the farm of defendant Northcutt, they were forbidden by him to proceed further therewith; that Northcutt and the other defendants maintained watergaps across said creek and plaintiff was not

permitted to pass through the same; that trees had been felled by defendants into said creek in order to prevent the passing of said rafts, and notices had been posted by defendants along said creek notifying plaintiff not to pass through said farms with said rafts. Mr. Wilkerson, who was interested in the success of plaintiff's rafting, called upon defendants in order to effect an amicable settlement of the matter prior to the institution of this suit. They admitted to him that they had felled the trees into the creek in order to prevent rafting, and defendant Kimberlin said to him, speaking for himself and the others: "This creek is worth a whole lot of money to you and you ought to be willing to pay us for it." The two Northcutts at the time, speaking for all, proposed that plaintiff pay $200, or $50 to each defendant for the privilege of rafting through their farms. Defendants also admitted to the plaintiff that they had obstructed the creek to prevent his rafting therein. It was also shown that the cost of floating the ties to market by means of the river is about five cents per tie and to convey them otherwise would not be less than fifteen cents per tie; that there was no other stream by which the rafts could be conveyed; that to raft in said stream was not detrimental thereto nor to the adjacent owners, inasmuch as the raftsmen were compelled to keep the streams clear of drifts and the flow of the water open, and in no case did they travel upon or interfere with the banks thereof; that defendants had threatened to cause the arrest of plaintiff and his servants in case they rafted through their farms or attempted to remove the obstructions from the creek; that plaintiff's business had been interfered with by such conduct of defendants to such an extent that it was suspended on account thereof and substantial damages had accrued to him as the result.

Testimony on the part of the defendants controverted in part that on behalf of plaintiff. An attempt was made to show that the trees felled into the creek was not for the purpose of obstructing the rafting but for the

purpose of changing the run of the creek, the main contention being, however, that the creek was not fit nor capable for rafting purposes, although the defendants admitted that it had been used below them for a number of years for that purpose and that they had never known it to be dry. One witness testified that he had seen it dry at one place at one time. This testimony was so in conflict with the major portion of the evidence in that respect, no doubt the court disregarded it entirely.

The court found the facts to be as contended for by plaintiff and assessed his damages at $1.00 and made the injunction permanent.

The appellants have failed to incorporate all of the evidence in the bill of exceptions. The notice which the record shows was posted by defendants notifying plaintiff not to raft through their farms is said to be lost and not in the bill of exceptions. That there was such a notice and that it was in evidence can be gathered from the record, but its exact contents is in no way shown. From what appears in the record, it seems to be potent evidence upon the question of the alleged conspiracy and joint action of the defendants.

Defendants, after unsuccessful motions for new trial and in arrest, appeal to this court, insisting, first, that the petition fails to state facts sufficient to constitute a cause of action and does not entitle plaintiff to the relief prayed for; and second, ask the court to find as a matter of fact that Indian creek is not a navigable stream within the meaning of the law; that is, it is not fit and capable for floating ties and commodities along its course to market.

NORTONI, J. (after stating the facts).—1. The learned counsel for appellant asks the court to review the finding of facts made by the circuit court and to declare upon the evidence that Indian creek is not a navigable stream and therefore is not subject to public use within the meaning of the law relating to such streams

as are capable of floating to market the products of the forest, mines and tillage of the soil along their courses. This being a case appealing to the equitable powers of the court, there can be no doubt that this court has the right to review such finding and that it is not precluded by the finding of facts made by the chancellor, although in cases where, as in this, witnesses testify orally on an issue of fact, the appellate court will defer somewhat to the finding of the chancellor, inasmuch as the opportunities of the trial court to see and hear the witnesses on the stand and to judge of the probable truth or falsity of the evidence is superior to the opportunities of this court to arrive thereat from the bare record. [Benne v. Schnecko, 100 Mo. 250, 13 S. W. 82; Mathis v. O'Neil, 94 Mo. 530, 6 S. W. 253; Berry v. Hartzell, 91 Mo. 138, 3 S. W. 582; Springer v. Kleinsorge, 83 Mo. 159; Bushong v. Taylor, 82 Mo. 666; Erskine v. Lowenstein, 82 Mo. 309; Chouteau v. Allen, 70 Mo. 336.]

The appellant has failed to incorporate all of the evidence in the record before us. Under such circumstances it would be most unfair to the parties to the suit, as well as to the trial court and likewise unfair to this court, for us to attempt to review the finding of facts when all of such facts are not open to our perusal and observation. It would be impossible to arrive at a just conclusion under such circumstances. It is an invariable presumption of this court that the proceedings of an inferior court are correct unless the contrary appears, and it devolves upon him ascribing error to the trial court to show it affirmatively here; but in the absence of such showing, it is always presumed that the judicial action of the court below is correct and that a solemn judicial finding upon facts submitted is amply supported by such facts unless the record clearly shows the contrary thereof to be true. As the rule is well settled in practice that he who seeks to reverse such finding must put his finger on the error of the court below and point out wherein it is unsupported, or at least, bring the whole

case here in order that this court may be fully enlightened in that behalf before it would be justified in overturning this well-founded presumption of correct action in holding that the judgment was unsupported by the evidence. In view of the state of the record before us, we decline to examine the finding of facts. [Christy's Admr. v. Meyer, 21 Mo. 112; Wentzville Tobacco Co. v. Walker, 123 Mo. 662, 27 S. W. 639; U. S. v. Gamble & Bates, 10 Mo. 457; Zugg v. Arnold, 75 Mo. App. 68.]

What has been said applies with equal force to the finding of the court on the allegation of confederation and conspiracy among the several defendants and their alleged joint action which would render them jointly liable, if liable at all, in this case, inasmuch as all the evidence in support thereof is not before this court, and especially is this true with regard to the alleged notice admitted on both sides to have been posted by defendants, but the contents of which and its exact purport, appears to have been omitted from the bill of exceptions. Therefore, we must presume that the court below acted rightly in finding a confederation to exist among the defendants whereby their joint liability is established.

2. In England, only waters in which the tide ebbs and flows are technically navigable, and this rule seems to be adhered to in a few jurisdictions of this country. A river or creek in which the tide ebbs and flows is not, however, navigable unless it is actually capable of navigation. In the United States, it would seem to be a matter of no great practical importance which rule obtains, for in all of the states of the Union the public has the same right, so far as regards the use of waters for the purposes of navigation, whether they are tidal or non-tidal, if it is actually navigable. In this country, the capability of use by the public for the purposes of the transportation of commerce rather than the extent and manner of that use, affords the true criterion of the navigability of waters. If they are capable in their natural state, of being used for the purpose of com-

merce, no matter in what mode the commerce may be conducted, they are navigable in fact, and become, in law, public highways. It is therefore laid down in 21 American and English Encyclopedia of Law (2 Ed.), at page 428, as follows:

"Streams of sufficient capacity to float logs or timber to market have been frequently declared to be navigable in fact. And this has been said to be true though at some particular point in their course, the streams are not of sufficient capacity to float logs without manual aid from the shore. Waters, to be navigable, must be so far navigable or floatable in their natural state and in their ordinary capacity as to be of public use in the transportation of property."

Waters which can be made floatable only by artificial means are not regarded as public highways. Nor is it necessary to constitute a stream navigable for floating and rafting within the law that they should be capable of continuous use during the whole year for that purpose. It is sufficient to render a stream navigable within the sense under contemplation, if, as a result of natural causes, it be capable of floatage or other navigation periodically during the year, and so continue long enough at each period to render it susceptible to beneficial use by the public. [21 Amer. & Eng. Ency. of Law (2 Ed.), 428-429.]

Judge Cooley says: "In this country there has been a very general disposition to consider all streams public which are useful as channels for commerce, wherever they are found of sufficient capacity to float to market the products of the mines, of the forests or of the tillage of the country through which they flow. And if a stream is of sufficient capacity for the floating of rafts and logs in the condition in which it generally appears by nature, it will be regarded as public, notwithstanding there may be times when it becomes too dry and shallow for the purpose. The capacity of a stream which generally appears by the nature, amount, importance and necessity

of the business done upon it, must be a criterion." [Cooley's Constitutional Limitations (7 Ed.), 861.]

Mr. Gould says: "In this country, where this question is more important than in England, notwithstanding the conflict respecting the title to large fresh-water rivers, the authorities agree that streams which, in their natural condition, are only useful for rafting purposes during the whole or part of each year, are highways for that purpose, and that the title of the riparian owners to the beds of such streams is subject to this right of passage." [Gould on Waters (3 Ed.), sec. 107.]

Farnham on Waters says: "Streams which are capable of floating to market the products of the soil along their banks are navigable within the rule subjecting a navigable stream to public use. The public have a right of way in every stream which is capable, in its natural state and its ordinary volume of water, of transporting in a condition fit for market the products of the forests, mines, or of the tillage of the soil upon its banks. It is not essential that the property to be transported shall be carried in vessels or be guided by the hand of man, if it can safely be carried without such guidance. Nor is it necessary that the stream shall be capable of navigation against its current. Nor that it shall be navigable at all seasons of the year, it being sufficient that it becomes navigable periodically from natural causes. But in order to come within the rule the stream must be actually capable of some profitable use. The capacity as shown by the use to which it is put is the true criterion by which to judge the question of navigability. It is sufficient if it is capable of floating vessels, boats or other crafts, or rafts of logs, or logs in quantities to make it of commercial value. The fact that the logs must be floated without being formed into rafts is not sufficient to destroy its navigable character; but the width of the stream may diminish to such an extent that only a single log at a time will float. Such a stream would be of no commercial value because the cost in time and labor in

getting quantities of logs through would destroy its usefulness. Such streams are not subject to public use. If the stream is capable of floating to a profitable extent it is navigable, and a public highway. The stream must, however, be capable of use in its natural state for it is not subject to public use if improvement is necessary to fit it for such use. Most streams fluctuate during the season of melting snow and the frequent fall of rains, and in periods of drouths becoming in some instances almost dry. The fact that in dry season the stream is not capable of use will not prevent its being used at other times when it is capable of it. But the period of capacity must be sufficiently regular and continued to make the stream of commercial importance. The stream may be used whenever its capacity is sufficient for that purpose. If the stream cannot be used without traveling along its banks to aid the passage of the logs it is not a navigable stream. But if the general character of the stream is such that it will float logs without any aid from the banks, the mere fact that persons using it find it convenient to go upon the banks and in fact, do so, will not destroy the navigable character of the stream. A way of necessity cannot be claimed to float logs down a stream if there are other means of getting them to market. The owners of the banks have certain rights in the stream which cannot be destroyed by the use of it for navigation. When the stream is in a condition to be used, the riparian owner cannot do anything that will interfere with the use. But the right of navigation does not authorize interference with the bed of the stream or with the banks or the destruction of property on the banks. The right to float is but a right of passage, and includes only such rights as are incident to the use of the stream for that purpose and necessary to render such use reasonably available." [Farnham on Water & Water Rights (vol. 1.), sec. 25.]

So we find that by concurrence of authorities, a stream capable of transporting rafts of railroad ties, as

in this case, for several months during the spring of the year, without the aid of men on the banks thereof, is navigable within the meaning of the law for that purpose and subject to the use of the public therefor, and the rights of the riparian owners to the soil adjacent to and underlying the bed of such stream are subject to this right or easement in the public, which rests upon the necessities of commerce; and where, as in the case at bar, it appears that there was no other practical route by which the ties could be transported to market, the adjacent owners would have no right to interfere with one using the stream for the commercial purposes indicated. Respondent had a right to occupy the stream in floating his ties to market without inflicting injury upon the adjacent property, and the appellants had no right to obstruct said stream as shown in the evidence, or otherwise interfere with respondent in the exercise of his privilege. The views herein expressed are abundantly supported by the courts of this country as will appear by reference to the following cases: Brown v. Chadbourne, 31 Me. 9; Bucki v. Cone, 6 South. Rep. (Fla.) 160; TenEyck v. Town of Warwick et al., 75 Hun 562; Webster et al. v. Harris, 59 L. R. A. (Tenn.) 324; Lewis v. Coffee County, 77 Ala. 190; Little Rock, etc., Ry. Co. v. Brooks et al., 39 Ark. 403; Sullivan v. Spotswood, 2 South. Rep. (Ala.) 716; Hickok et al. v. Hine, 23 Ohio 523; Commissioners of Burke County v. Catawba Lumber Co., 21 S. E. (N. C.) 941; State v. Baum, 128 N. C. 600; Heyward v. Farmer's Mining Co. et al., 19 S. E. (S. C.) 28, L. R. A. 42; Moore v. Sanbourne, 2 Mich. 519; Lamprey v. State of Miss., 18 L. R. A. (Minn.) 670. The Supreme Court of Wisconsin has well said: "The use of rivers and smaller streams for floatage of logs is essential to the continued prosperity of the immense lumber and industrial interests of northern Wisconsin." [Keater Lumber Co. v. St. Croix Boom Corp., 72 Wis. 80.] And it is upon this idea that the right to such use of the floatable streams is vested in the public. The same can truthfully

be said of the industrial interests of this State. While our lumber and timber industry is not so great nor so far-famed as that of Wisconsin, it is one of the most important industries of the State and it is a matter of common knowledge that a large section of southern Missouri, traversed by the Ozark mountains, is rich in timber and poor in its facilities for transporting it. It is essential, therefore, in many instances, to rely upon the smaller streams in order to transport the products of the country to market. This condition should be recognized and considered by the courts with a view not only to aid the industry itself, but as well to facilitate the progress and development of the State and afford an expeditious means of transportation to the end that the citizen, in the one instance, may convey his property to market with a reasonable expenditure, and that the citizens of the State, in the second instance, may enjoy the fruits of the forests, mines and fields without being called upon to recoup extraordinary charges for transportation. This seems to be the underlying principle upon which rests the law authorizing the public use of smaller streams passing through private property.

3. The question of whether or not the stream is navigable for the purposes of rafting and floating the products of the forests, mines and fields along its course, is ordinarily one of fact for the jury and the burden of establishing such fact and its commercial importance rests upon the party affirming it to be true, as in ordinary cases. There are cases, however, in which the courts can and do take judicial notice of the navigability of streams. The rule, however, applies only to fresh water streams as all tide water is prima facie considered to be navigable and the burden in that case is on the party alleging the contrary. [21 Amer. & Eng. Ency. of Law (2 Ed.), 429; 1 Farnham on Water & Water Rights, sec. 26; Bucki v. Cone, 6 South. Rep. (Fla.) 160; Little Rock, etc., Ry. Co. v. Brooks et al., 39 Ark. 403; State v. Baum, 128 N. C. 600.]

The courts would certainly take judicial notice of the navigability of the Mississippi, Missouri, Gasconade and Osage, and no doubt other of our principal rivers, inasmuch as the character of these streams is such that their navigable capacity for such purposes is a matter of common knowledge. [Farnham on Water & Water Rights, sec. 26.] And in view of the fact that our public surveys terminate on the Missouri river and on the Osage as far up as Osceola, and on the Gasconade, for some distance, the government retaining the title to the bed of such streams, this being a governmental recognition of the navigable capacity of such streams for steamboats in the carriage and transportation of our commerce, it has been referred to by our Supreme Court as the probable proper test of their navigability for that purpose since we have no navigable streams in this western country which come within the ancient common and civil law definition thereof. [Benson v. Morrow, 61 Mo. 349.]

Be that as it may, however, the question of the navigability of Indian creek for the purpose alleged in the bill and the issues in this case was a question of fact for the trial court, and as such the parties treated it, introduced evidence thereon and the court found the fact to be that it was a navigable stream at the point in controversy and on to the Meramec river. Enough appears in the record to show that such finding is supported by substantial evidence and in view of the fact that all of the evidence pro and con on the subject is not before us, this finding of the learned trial judge will be affirmed unless there appears other sufficient reasons for a reversal of the judgment.

4. It is insisted that the petition fails to state facts sufficient to constitute a cause of action. The sufficiency thereof was not challenged by demurrer. It was raised by oral objection at the opening of the trial. Appellants having answered over and gone to trial, all objections as to the sufficiency of the petition were thereby waived save its sufficiency to support the judgment. Howe v.

Ins. Co., 75 Mo. App. 66. The provisions of our statute of jeofails (sec. 672, R. S. 1899), and the adjudicated cases on the subject, certainly render the petition good after verdict. When once a party has answered over and gone to trial, it is only where the petition wholly fails to state a cause of action that a reversal can be had therefor after verdict. In case the petition wholly fails to state facts entitling plaintiff to relief, the objection is equally fatal after verdict as is a total want of jurisdiction over the subject-matter. [Weill v. Green County, 69 Mo. 286.] But the mere fact that the petition is defective and subject to a general demurrer, does not render it insufficient to support a verdict. The well-settled rule is that if a material matter be omitted from a petition, but is necessarily implied from what is therein stated, the defect is cured after verdict. This doctrine rests upon the presumption that plaintiff proved on the trial the facts imperfectly alleged, the existence of which he was required to prove before the court could give him a finding. [People's Bank v. Scalzo, 127 Mo. 189, 29 S. W. 1032.] The facts stated in the petition are sufficient to support the judgment and the assignment must be ruled against appellants.

From what has been said, it is apparent that it is quite unnecessary to review separately the several matters presented in the briefs. It would serve no purpose but to prolong the opinion.

Finding no reversible error in the record, the judgment is affirmed. It is so ordered. All concur.