BIRDIE FRONK, Respondent, v. J. L. and LOTTIE FRONK, Appellants.

**Kansas City Court of Appeals, December 4, 1911.**

1. **PRACTICE, APPELLATE: Abstracts of Record.** Where it is desired to have a demurrer to the evidence considered by the appellate court, appellant must abstract alll of the evidence of all of the witnesses. It is not necessary to set it out by question and answer, but it may be put in narrative form, in the words of the witnesses.

2. **DAMAGES: Alienation of Affections.** There is no inference of malice from the mere fact that parents interfere in the marital relations of the child, and therefore where damages are sought for the alienation of the husband's affections, the proof must go farther and show that the interference of the parents was without just cause or excuse.

3. ———: ———: **Evidence.** Where the evidence shows probable cause for the interference by the parents in the marital relations of their son, and that the evil conduct and vile acts of the husband were the only cause for the separation of the husband and wife, a judgment against the parents in favor of the wife cannot be sustained.

Appeal from Harrison Circuit Court.—*Hon. G. W. Wanamaker*, Judge.

REVERSED.

*Wilson & Wilson, L. W. Phipps* and *Kelso & Kelso* for appellants.

*DuBois & Miller* and *John Ewing* for respondent.

JOHNSON, J.—This action was begun in the circuit court of Worth county, September 1, 1909, to recover actual and punitive damages for the alienation of the affections of plaintiff's husband. The defendants are the father and step-mother of the husband, Harry Fronk, and the petition alleged that they

''wrongfully, wickedly and maliciously acted and co-operated together with the wrongful, wicked and malicious intent to cause plaintiff's said husband to leave and abandon her . . . and on or about the——day of January, 1909, the defendants, pursuant to their said wicked, wrongful and malicious intent did wrongfully, wickedly and maliciously entice, influence and induce plaintiff's said husband to leave and abandon her,'' etc.

The answer, in addition to a general denial, pleads that plaintiff voluntarily separated from her husband and recites certain facts tending to show that the alienation of husband and wife had become complete before the date stated in the petition and was created by other causes than those charged in the petition. Further, the answer alleges ''that repeatedly during the married life of the said plaintiff and her said husband, Harry E. Fronk, these defendants have counseled together and done everything in their power to induce said plaintiff and her said husband to live peaceably and happily as husband and wife.''

The first trial of the cause resulted in a verdict for plaintiff, but a new trial was granted defendants and, afterward, on motion of plaintiff for a change of venue, the cause was sent to Harrison county, where it was tried again, resulting in a verdict and judgment for plaintiff for two thousand dollars actual and five hundred dollars punitive damages. After unsuccessfully moving for a new trial and in arrest of judgment defendants appealed. Their principal contention is that the court should have granted their request for a peremptory instruction.

At the threshold of our inquiry into this branch of the case we are confronted with a vigorous attack made by respondent on the sufficiency of the abstract of the record filed by appellants to present as an issue in this court the question of the soundness of the ruling of the trial court in refusing to direct a verdict for

the appellants.   The insistence of respondent is that
the rules of appellate procedure in this State require
an appellant, if he would have his demurrer to the
evidence considered on appeal, to set out in his ab-
stract all of the evidence *in haec verba* and that appel-
lants have not presented all of the evidence in their
abstract, nor have they given the testimony of the wit-
ness in the form of the questions and answers asked
and answered at the trial and preserved in the bill of
exceptions.   In support of this contention, and for that
purpose only, respondent has filed an additional ab-
stract containing extracts from the bill of exceptions.
Appellants insist they have complied with the rule by
reciting all of the evidence.   To aid in the settlement
of this dispute the parties have brought the bill of ex-
ceptions and we have taken the pains thoroughly to
go over these several documents.   The bill of excep-
tions contains approximately three hundred typewrit-
ten   pages   of   evidence   consisting   chiefly   of   the
testimony of witnesses.   The abstract of appellants
includes about seventy-five printed pages of evidence
in a condensed form.   The abridgement does not con-
sist of the omission of any of the evidence.   The testi-
mony of every witness is included, but such testimony
is given not in the form of questions and answers but
in what purports to be the witness's own narrative.
The abstract states on its face that it contains all the
evidence and we think it does in a narrative form.

The first question, therefore, is this: Were the
appellants required by the rules of procedure to ab-
stract the testimony of witnesses in the form of ques-
tions and answers and without any abridgment of the
bill of exceptions, in its recitals of such evidence? In
Doherty v. Noble, 138 Mo. 25, the Supreme Court say:

"Appellate courts review the evidence in equity
cases and unless all of it, *or its substance* (italics
ours), is preserved in the record, we must act on the

presumption that the trial court decided correctly. The omitted evidence may be controlling and we must assume that it was.''

In Reed v. Peck, 163 Mo. l. c. 336, the same court say: ''Appellants virtually concede that all of the evidence is not embraced in the abstract, the evidence of several of the witnesses being left out entirely, while as to others only a brief synopsis or summary of what is called by defendants the substance of such testimony. As was said in the case of Epstein v. Clothing Co., 67 Mo. App. 221: 'It will not do to allow appellant's counsel to cull over the record and present such evidence as they may think pertinent or material; the *entire evidence* must be set out, so that this court may, for itself, determine its materiality and probative force.' So in Davis v. Vories, 141 Mo. 234, it was held that the Supreme Court will not pass upon the insufficiency of the evidence where it is not fully set out in the record. The same rule is announced in Ogelbay v. Kansas City College of Dental Surgery, 71 Mo. App. 339.''

And in Harrison v. Pounds, 190 Mo. 349, where certain important evidence was omitted from the abstract it is held: ''It is the settled rule of law in this court that,where we are asked to pass upon a demurrer to the evidence or as to whether there is any evidence to establish a fact, the appealing party must bring all the evidence before this court; otherwise we will not disturb the finding of the trial court.''

Passing to the decisions of this court on the same subject, the first case to which our attention has been directed by respondent is Goodson v. Railway, 23 Mo. App. 76, where this court, speaking through Hall, J., says: ''The appellant should have set out in his abstract, *in haec verba,* so much of the transcript as contained all the evidence on that question. Without such an abstract we are unable to say what was the evidence or what was its effect, unless we examine the tran-

script. The appellant in his abstract has not pretended to set out the evidence as contained in the transcript in the words used in the transcript. The appellant has simply set out in the abstract his version of the evidence, that is to say, what the effect or meaning of the evidence was in his opinion. Without the words used in the transcript we cannot treat the abstract as the record itself.''

To the same effect is the decision in Meriwether v. Howe, 48 Mo. App. 148. In Nash v. Brick Co., 109 Mo. App. l. c. 604, in an opinion written by SMITH, P. J., we say: ''When a case is brought here by appeal or writ of error and the defendant assigns for error the action of the trial court in denying a demurrer interposed by him to the evidence adduced by the plaintiff in that court we will not consider such assignment unless the whole evidence is set out *in haec verba* in the abstract. This rule has been long established and steadily observed. [Goodson v. Railroad, 23 Mo. App. 76; Meriwether v. Howe, 48 Mo. App. l. c. 152; Doherty v. Noble, 138 Mo. 25.] The abstract in the present case presents a number of excerpts of the evidence taken from the bill of exceptions and mingled with statements of the substance of other parts of it, or with defendant's conclusion as to what such other parts of it conduces to prove. The abstract, therefore, does not present the entire evidence, and accordingly we cannot review the actions of the trial court on the demurrer.''

In Keithley v. Independence, 120 Mo. App. 255, we hold that when the abstract disclosed that some but not all of the evidence relating to a certain issue was given, the appellant was in no position to obtain the opinion of this court on the sufficiency of the evidence to support the ruling attacked. Speaking of this case and of Nash v. Brick Co., supra, we say, in Haggard v. Walker, 132 Mo. App. l. c. 465: ''These cases were intended to apply to cases where the court could

not know without all the evidence before it, what the testimony as a whole bearing on the issue might prove, or where it was evidence that there was other evidence which had been omitted from the abstract that would supply or tend to supply the apparent lack of evidence on the part of plaintiff to support the issue. A fair illustration of this view is found in Harrison v. Pounds, 190 Mo. 349.''

And the St. Louis Court of Appeals say in Plumbing Co. v. Brewing Co., 126 Mo. App. l. c. 270: ''The appellant has failed to print and present the entire evidence in its abstract for our information and under such circumstances, the appellate court indulges the presumption of correct action in favor of the trial court thereon, and this presumption goes to the extent of assuming the evidence omitted from appellant's printed abstract is sufficient to supply the deficiency of which it complains. Defendant having failed to print and present in its abstract all of the evidence, the challenge against its sufficiency is therefore overruled. (Reed v. Peck, 163 Mo. 333, 63 S. W. 734; Davis v. Vories, 141 Mo. 235, 42 S. W. 707; Zweigardt v. Birdseye, 57 Mo. App. 462; Ogelbay v. K. C. College, etc., 71 Mo. App. 339; Irvine v. Karnes, 58 Mo. App. 254; Epstein v. Clothing Co., 67 Mo. App. 221; McKinney v. Northcutt, 114 Mo. App. 146, 89 S. W. 351.)''

An analysis of all these cases leads us to state the rules applicable to the present abstract as follows: An appellant who would have his demurrer to the evidence considered by the appellate court must abstract all of the evidence and on the showing that he has omitted a part, the presumption of right acting on the part of the trial court will become conclusive and will preclude a consideration of the demurrer. But the rule will be deemed complied with if the substance of the evidence be given. [Doherty v. Noble, supra.] If all the testimony of witnesses be given

in the narrative of the witnesses, that is giving the substance of the evidence. Not so if the narrative be that of the lawyer, for, in such case, the court cannot know whether the lawyer is stating what the witness said or only his own interpretation of the testimony. All that is meant by the expression in the Goodson and Nash cases, supra, that the testimony of witnesses must be set out *in haec verba* is that the testimony of witnesses must be given in the words of the witnesses and not in the language of the narrator. We did not mean to hold that the questions and answers must be recited as they appear in the bill of exceptions.

We find the abstract in question to be sufficient under these rules and proceed to the merits of the contention that the court erred in overruling the demurrer to the evidence.

The gist of the cause pleaded in the petition is that the parents of plaintiff's husband, actuated by a malicious intent, conspired and co-operated to bring about the separation of their son and his wife. The law is very jealous of any outside interference with the marital relation and when such interference comes from one not bound to either party by close ties of consanguinity, will imply a malicious intent from the very fact that a stranger has intentionally thrust himself between husband and wife to the destruction of their mutual happiness and confidence. But no such inference of malice will flow from the mere fact of parental interference in the marital relations of his child. In such cases the proof of the plaintiff must go further and show that the interference of the parent was without just cause or excuse. The law recognizes the natural solicitude of the normal parent for the welfare of his child and will not condemn the interest and even interference a parent may be prompted to manifest and interpose in his child's domestic af-

fairs, as long as his conduct is actuated by a *bona fide* endeavor to serve the child's best interests.

"Circumstances will excuse a parent for advising a child regarding his or her domestic affairs, and even influencing a separation from the child's spouse which will not always suffice to excuse the like interference by other persons. All the authorities support this proposition." Barton v. Barton, 119 Mo. App. l. c. 531.

"The motives of a parent in harboring, sheltering and otherwise extending aid and assistance to a child are presumed to be good until the contrary is shown." Pollock v. Pollock, 29 N. Y. Supp. 27.

"It may reasonably be presumed that they (parents) have acted with commendable motives, and a clear case of want of justification may be justly required to be shown before they should be held responsible." Cooley on Torts (2 Ed.), p. 264.

In Leavel v. Leavel, 122 Mo. App. l. c. 66, we said in an opinion, written by Ellison, J.: "Every legal presumption is that the parent acted for the best interest of the child. [Reed v. Reed, 6 Ind. App. 317.] Can it be said that if a parent shall advise his child in good faith, he does so at the risk of financial ruin? 'It would be strange, indeed, if parents, under peril of legal consequences, must keep silence under such circumstances, or must clothe in terms of respect their expressions of outraged feeling, when even strangers would be excused for speaking wtih freedom.' [White v. Ross, 47 Mich. 172.] So it has been ruled that a parent acting in response to natural affection may, in good faith, advise his child in favor of a separation, if justified by his information, although such information may be unfounded. [Bennett v. Smith, 21 Barb. 439, 443, 445.] This court has ruled, in an opinion of the presiding judge, that there was a broad distinction to be made between the acts of a stranger interfering with marital relations and acts of parents.

[Love v. Love, 98 Mo. App. 562.]   And it was likewise so stated by the St. Louis Court of Appeals in Barton v. Barton, 119 Mo. App. 501, 94 S. W. 574. Parents may, of course, be guilty of maliciously separating their married children and thereby render themselves liable in damages.  As in Nichols v. Nichols, 147 Mo. 387, where they took the initiative and avowedly separated them, by taking them apart and writing and having published notices in the son's name forbidding any one to trust or harbor the wife.''

Since plaintiff has alleged a conspiracy and cooperation between defendants to separate her from her husband, she must recover, if at all, on proof of such cause (Barton v. Barton, supra) and, as we have shown, must further prove that the conduct of which she complains was not such as should be characterized as a natural result of parental solicitude, but amounted to a clear case of want of reasonable justification.  With these legal principles in mind, we turn to the evidence of plaintiff to ascertain whether or not she has presented a case which should have been sent to the jury.

Plaintiff and Harry Fronk were married in 1897. She was seventeen years old, he, eighteen.  Plaintiff says her father-in-law opposed the marriage, but there is uncontradicted evidence to the effect that he gave his written consent to the issuance of the marriage license and it is clear, therefore, that his opposition was not of a very positive nature and was occluded by his desire to please his child.  The boy's mother was living at the time but died shortly after the marriage and in 1900, the father (defendant) intermarried with his co-defendant, Lottie.  Defendants lived on their farm near the town of Worth and prior to March, 1904, plaintiff and her husband lived with them most of the time.  Plaintiff endeavors to show that defendants cherished and exhibited ill will towards her during that period.  In our opinion the evidence

falls short of disclosing continuous ill feeling and be-speaks no more serious condition than the occurrence at rare intervals of family disagreements in which de-fendants said some unpleasant and uncomplimentary things to plaintiff. On the whole it appears that the home life of the two families was more pleasant and free from discord than is usual where two families make the dangerous and generally unsuccessful at-tempt of trying to live together under one roof. Plaintiff herself says that she and her husband were happy and contented and that discord between them did not appear until after their separation from de-fendants. We hold there is not the slightest evidence to sustain the argument of plaintiff that defendants attempted to lay a foundation for the separation of the young people or even thought of such a thing.

In 1904, defendants bought a farm of one hun-dred and twenty acres in Linn county and entered into a contract with plaintiff and her husband, the sub-stance of which was that the young couple should oc-cupy, cultivate and improve the farm for five years as the tenants of defendants and that the two families should divide the profits. Defendant furnished some live stock for the farm and Harry provided some agri-cultural implements and other personal property. The young family which consisted of plaintiff, her husband and their two small children, moved to this farm and cultivated it. The two families were widely separated and did not see much of each other during the next three years. There is no evidence that defendants in-terfered in any way in the domestic affairs of plain-tiff before the summer of 1907, and then their inter-ference was besought by plaintiff herself. In the meantime, Harry and his father had gone into the stock shipping business. Harry was the active part-ner and took the stock shipped by the firm to the stock markets at St. Louis and Kansas City. The father owned a controlling interest in a little bank in Worth

and was the financial partner. The business proved demoralizing to Harry. Rapidly he fell into evil ways and practices while in these large cities, the most vicious of which were associations and entanglements with lewd women in both cities. He squandered money and time in his dissipations and, of course, neglected his family. His absences from home became more frequent and prolonged and when he returned, frequently he brought with him strong evidence of his debauches. In August, 1907, plaintiff wrote her father-in-law complaining of her husband and asking him not to furnish him any more money for stock shipping, and afterward, on a brief visit of the father-in-law to plaintiff's home, during the absence of her husband, she told him that Harry was consorting with other women and was losing ground financially. She begged him to stop the stock business and states that he replied that if he were in her place he would leave Harry. She replied, in effect, that she did not wish to leave him but to reform him. At this time, Harry had overdrawn his account at the bank and was indebted to his father. The stock shipping business went on and Harry kept going from bad to worse. At last, in the spring of 1908, he absented himself from home an unusually long time and finally wrote to a friend to borrow money. He disclosed in the letter that he was in Kansas City with a lewd woman, named Marie, in a house of ill-fame. His friend told the news to plaintiff, she communicated it to defendants and they came to plaintiff's home. Defendant Lottie stayed with the children while plaintiff and her father-in-law went to Kansas City to reclaim the erring Harry. After many toils and disappointments they found him in the house of ill-fame that harbored Marie. He was living there and was ushered into the presence of his father and wife without knowing who desired to see him. "How's Marie?" demanded the outraged wife. "She's all right, I reckon," sheepishly

responded Harry. "Don't you often think of me and the children when you're in such places?" inquired plaintiff. "Now, Bird, don't throw that up to him," interrupted the protecting father. Then, turning to his son, the father asked, "Won't you go back with us?" The son would and did and the three returned to plaintiff's home. Defendant Lottie met them at the train and effusively embraced and kissed the profligate. A conquering hero could not have had a warmer homecoming.

The conduct of the young man and the financial losses and difficulties resulting from it were the subject of conversations between plaintiff and defendants and plans were laid by them for Harry's reformation which required the co-operation of both the parents and wife. In these conversations defendants advised plaintiff to leave her husband and apply for a divorce but she refused to consider such advice. Defendants said some harsh and unjust things to plaintiff and, to say the least, they were inconsiderate of her and her children in financial matters. They appeared to think, and gave expression to the thought, that she was the cause of her husband's downfall. The grounds given for their belief were that she was an untidy housekeeper and was too sharp in her reproofs of her husband for his misdeeds. We quote from one of the conversations as detailed by plaintiff. "Mr. Fronk said, 'What are you going to do about this?' [Referring to a debt created by Harry.] I said, 'Do you expect us to pay this back with eight per cent interest?' Lottie said, 'Yes.' I said, 'That will be a lifelong debt.' (The debt amounted to about $1,000.) And he (Mr. Fronk) said, 'Well you and Harry never did make anything and you never will. Now you got a good excuse to get a divorce and I will pay for it and you can get a man that's got money and Harry can get a woman that knows more.' I said, 'I don't want any other man.' He said, 'No

man on earth can live with you. We will take Harry home and make a man of him.' "

The evidence shows beyond question that plaintiff was a good woman, a kind and forgiving wife and that she made a heroic struggle to protect her home and keep her little family together. She did use woman's most potent weapon in her efforts to retain her husband, but we share the view of one of the witnesses who said to the defendant, Lottie, that plaintiff did not scold her husband enough. She kept her long vigils on the farm and toiled in a vain effort to replace the substance he squandered and the only criticism that could be made of her conduct is that she was too forbearing and too forgiving. Harry did not forsake his evil ways and in a short time resumed stock shipping and, of course, returned to the companionship of his mistress. Plaintiff notified defendants and another family conference was held. All agreed that Harry must be crazy and they agreed to have him examined by his brother who was a physician at Maryville. The brother was sent for and came in response to the summons. He talked with Harry and came to the sensible conclusion that he was just mean and not crazy. All agreed that he needed a change of scene and occupation. They talked of sending him to California. Defendants wanted him to live with them at Worth but plaintiff objected and it was agreed he should go west. He stayed with defendants two months and then went to Montana. He found work there but was overtaken by ill health and, unable to work, became destitute. He corresponded with plaintiff and with defendants and advised them of his condition and begged their assistance. Plaintiff sent him five dollars but failed and, we think, refused his subsequent appeals for more money. She had four or five hundred dollars in money and defendants were indignant at her refusal of his request. Actuated partly by this indignation, but more by their love for their unfortunate

son, they sent him the following letter, written by the defendant Lottie:

"Your father wishes me to write you. He just got a letter from the Gregson Springs asking if he would help you, for you were sick and broke. He says if you are willing to leave Bird and have nothing more to do with her, he will help you, otherwise he won't. He feels he would rather see you die than to live with her. He wonders why Bird hasn't sent you any money, for she has four or five hundred dollars. He says she has not been here since she came back nor he won't never have her come either. Why didn't you answer Denny's letter. In that we wanted to know the particulars of your condition. We didn't understand reports of others through Bird that you was in such bad condition and the card Denny got and Dessie also wrote she got a card from you, your father got a letter from Mr. J. W. Thornton about a note of $240 you signed your father's and your name to that your father didn't know anything about until he went to Bucklin in October. And he, Mr. Thornton, intimates in his letter to-day a suit, if your father doesn't pay it.

"We heard that Bird said she had not wrote you she had got this money from your father and didn't intend you should know it.

"Harry why don't you use your life insurance policy to get money on? Harry I have tried to write as your father has dictated. You must brace up and try to get well. I think of you so often, and often pray that God may heal you both soul and body, but He can't do it without you co-operate with him. I'll continue praying for you for your mother' sake and for Jesus sake. Write if you can right away, or if you can't write get someone else to write and tell us all about yourself. With much love,

"LOTTIE L. FRONK."

Harry returned to Worth in response to this letter and, thereafter, lived with his parents, refusing

to live with his wife and children who, in the meantime, had removed to Worth. He annoyed his wife in various ways and threatened to take the children from her. In May, 1909, she instituted a divorce suit against him and obtained an order restraining him from interfering with the custody of her children. In her petition she alleged that he assaulted and beat her in August, 1907, and in May, 1908, and that in May, 1908, he committed adultery with Marie Long in Kansas City.

In 1908, defendants and Harry gave a chattel mortgage on all of the personal property on the Linn county farm which was owned by them in common, to secure an indebtedness created by Harry. Afterward defendants caused the property to be sold under the mortgage but to remove the opposition of plaintiff to the sale, paid her $285. The property sold for enough to satisfy Harry's debts and leave a remainder of about $250, which was all the compensation defendants received for the rental of the farm for three or four years. Defendants were angry at plaintiff on account of the position she took in this transaction and the breach between the parties became complete. Defendants had been trying to get possession of the farm for sometime and some of the means they used to force plaintiff to abandon the place are deserving of severe condemnation. As we said before they were harsh and unjust to plaintiff and their conduct towards her no doubt moved the two juries which tried the case to return verdicts against them. Plaintiff did not leave the farm until after the sale of the property and until after Harry had gone to Montana.

There are many other facts and circumstances disclosed in the evidence but those we have stated afford a proper understanding of the events which caused the estrangement and separation of this husband and wife. The evidence clearly shows that the vicious conduct of the husband was the sole cause of the estrangement

and separation and that defendants, though they disliked plaintiff, and treated her badly, acted not out of malice towards her but out of love for their degraded son, and in the vain hope that they could reform him. They were deeply distressed over his profligacy and debauchery but instead of realizing the obvious truth that his own depravity was the cause of his downfall, their love prompted them to seek excuses for him. The dislike they conceived for plaintiff and their injustice towards her were the fruits of their belief that she had driven her husband, their son, to a course of sin and shame. They were wrong in this belief but honestly wrong. Their acts were inspired by love, not by hatred or malice. They did not conspire to wreck the domestic happiness of plaintiff, but they did seek the salvation of their son who was on the road to destruction. To hold that they transgressed the limits of parental propriety would be to hold that a parent cannot obey the impulses of true parental love without being fined in damages. There was probable cause for the interference of these parents and that cause was the complete demoralization of their son. In her divorce petition plaintiff alleges that the evil conduct and vile acts of her husband were the cause of their separation and, in truth, they were, the only cause of the estrangement of the couple. Under the rules of law to which we have referred the proof of plaintiff falls short of sustaining her cause in several of its most vital elements.

It follows that the judgment must be reversed. It is so ordered. All concur.