TIMOTHY HICKEY *et al.*, Plaintiffs in Error, *v.* JAMES HAZARD *et al.*, Defendants in Error.

### April 4, 1877.

One having surveyed, marked, and staked off ice, unappropriated by another, upon a navigable river, and having expended money to preserve it and make it valuable for use, and as a commercial commodity, has a possession sufficient to support an action for trespass.

ERROR to St. Louis Circuit Court.

*Reversed and remanded.*

*A. R. Taylor*, for plaintiffs in error, cited: Const. of Mo. (1865), sec. 2, art. 11; Benson *v.* Morrow, 61 Mo.

353 ; 7 Wall. 272 ; Tarry *v.* Brown, 34 Ala. 159 ; Craig *v.* Gilbreth, 47 Me. 416.

*R. S. McDonald*, for defendants in error, cited : 1 Schouler's Pers. Prop. 86 ; 1 Cooley's Bla. Com. 339 ; Broom's Leg. Max. 264 ; The State *v.* Pottmeyer, 33 Ind. 402.

BAKEWELL, J., delivered the opinion of the court.

The plaintiffs state in their petition that they are copartners, and that defendants are copartners ; that on January 13, 1875, plaintiffs owned and were in possession of 1,000 tons of ice, worth $2,000 ; and that defendants violently and wrongfully drove plaintiffs and their servants off, and unlawfully took and carried away said ice, and converted the same to their own use, to the damage of plaintiffs $2,500, for which they ask judgment. The answer of defendants denies all the material allegations of the petition.

On the trial the plaintiffs introduced evidence tending to show that, in January, 1875, they had a contract with Wainwright & Co., of St. Louis, to deliver them ice at $1.75 per ton ; that, for the purpose of fulfilling that contract, plaintiffs, during a hard frost, selected a spot on the Mississippi River, opposite the foot of Chouteau Avenue, in St. Louis, and on the eastern side of the stream, the ice being at that time gorged in the river, which was favorable to the making of good ice, the water being clear, and, owing to the eddy and slack-water there, the character of the ice forming being of a good quality ; that the mass of the gorged ice in the river was utterly worthless, but that there were, here and there along the Illinois bank, patches of ice which, with proper attention, could be made of considerable value ; that, so soon as the ice would bear, plaintiffs staked out their claim, marking it with stakes, and plowing all around it with a snow-plow a line about 360 feet in extent, thus inclosing a triangular patch of clear ice, the base of the triangle being about sixty feet ; that plaintiffs engaged a flat-boat on the spot to remove this ice, and employed a body of men to watch it day and night, who kept it constantly swept and

free from skaters; that otherwise the ice would have been spoiled for mercantile purposes from sand and drift-snow blowing upon it; that they retained, by themselves and their hands, constant actual possession of this piece of ice for about two weeks, and up to the date of the wrongs complained of, and expended in this work about $239, and thus gave to this piece of ice considerable commercial value; that the ice, at the date of the trespass, was about a foot thick, and worth about $1 per ton as it lay; that plaintiffs then had it surveyed and measured, and found, it contained about 600 tons; that the claim was recognized as plaintiffs' by the neighboring barge-men and persons on the nearest bank, and that plaintiffs had obtained the written consent of a man residing on the bank opposite to this ice to cut ice in front of his premises; that, about January 13th, and as soon as the ice was ready to cut, one of the defendants, armed with a pistol and accompanied by about fifty men in his employ armed with clubs and ice-picks, by threats and violence, drove plaintiffs and their hands from the ice, in spite of the remonstrances and resistance of plaintiffs and their men — one of defendants declaring that he would have the ice if it cost $1,000 or a life; that a shot was fired; that defendants were overpowered by a force very greatly superior to their own, and compelled to retire; that one of plaintiffs at once proceeded to Belleville to institute legal proceedings to restrain defendants from cutting this ice, but did not succeed in getting proper service, or service in time; and that defendants, with their hands, proceeded at once to cut up this area of ice which had been occupied by plaintiffs, and carried the same away and stored it.

These facts were testified to on behalf of plaintiffs by a large number of witnesses.

At the close of plaintiffs' case, defendants asked an instruction in the nature of a demurrer to the evidence, which was given by the court, and plaintiffs took a nonsuit. The court refused to set the nonsuit aside, and plaintiffs appealed.

We do not know why plaintiffs were not allowed to go to a jury with their case. Their testimony clearly showed the commission of a high-handed outrage in violation of plaintiffs' rights. If there were no remedy for such a wrong as this, our boasted civilization would be a farce, and men would be left to contend like wild beasts for their rights of person and property, and each weaker individual would be completely at the mercy of his superior savage. We think that plaintiffs had an appropriate remedy, and should have recovered on their evidence.

Instances yet remain where, from the nature of the thing, it is necessary to resort to the natural title of occupancy — as firm a title as any other when it is the appropriate one. A man may have, by occupancy, a qualified property in goods of the most fugitive character—in the elements themselves of fire, air, light, and water ; and, when disturbed in his actual possession and use of them, may maintain his action and recover damages. Waifs and treasure-trove belong to the first one who takes possession. Even where there is a common right, as to fish in the sea and public waters, one disturbed in the previous actual occupation and exercise of the right will be protected by the law ; for here the doctrine of prime occupancy will literally apply, and, when one is in the exercise of a common right, another may not interfere to expel and disturb him.

All rivers and navigable streams belong to the public, and the right to fish in them is common to all. Every person has a right to take fish found on the sea-shore, and to dig for shell-fish below high-water mark. The right to take sea-weed growing or accumulating on the bed of a navigable river is also in the public. 9 Conn. 38 ; 5 Day, 22 ; 4 Burr, 2162. These acknowledged principles of the common law applied to the peculiar circumstances of this case make it perfectly clear that the plaintiffs here had rights which the law will recognize and protect.

Whilst the jurisdiction of the State of Missouri is declared

by the Constitution of 1865 to be concurrent with that of Illinois over the Mississippi River, so far as that stream forms a common boundary between the States, that river is a common highway, and free to the citizens of the State, and of each State of the Union, and of the United States.

The soil under the Mississippi River does not belong to the riparian proprietor. By virtue of its size and character, and of public acts, laws, and treaties, the Mississippi River is a navigable stream, and the soil under it, *ad filum aquæ*, belongs to the States respectively between which it runs. 15 How. 426; 3 Iowa, 1. The common-law doctrine, or what is declared to be the common-law doctrine in Blackstone and some later writers on the common-law, that a river is navigable only as far as the tide flows, does not apply to large navigable streams in the United States. 14 Serg. & R. 71.

Whilst we assert these recognized principles, we do not do so because in this case any question arises, or can arise, of trespass to realty. Cutting ice on a navigable stream in such a way as not to interfere with the use of its waters for commerce or navigation, or any use to which the stream may be put by the general public, is not a trespass, though the land beneath the stream belongs to the State, and the ice be cut without a license from the proprietor of the soil. It is not to be likened to cutting down trees on the public domain, or cutting ice on a pond on public or private property. The surface of the river is free to all; and in the water itself, whether in its running state or congealed, there can be no property except that derived from possession. The ice is not permanently attached to the soil, though the edges of the mass may rest upon it. It in no way depends directly upon the soil, even for support, though rendered temporarily motionless by its mass, or other circumstances. If trees in a nursery, though drawing nutrition from the soil, are not a part of the realty — and, as between lessor and lessee, they are not — much less can ice on the bosom of a

navigable stream, though temporarily fixed in position by a gorge or otherwise, be considered a part of the soil. It is no more realty than is a log of drift-wood jammed against the piers of the bridge.

The right to reclaim portions of this ice and give it a commercial value, derived almost wholly from the labor bestowed upon it, is a right which may be assimilated to the right of reclaiming animals wild by nature. These can only be reclaimed by actual possession. 7 Johns. 16. The right to appropriate such property does not depend entirely upon the place in which it is found; as, to all inanimate objects, an absolute property in possession may be acquired in them. And, as to animals *feræ naturæ*, a qualified property may be acquired by taming them. If defendants had actual information of the appropriation and ownership of this defined strip of clear ice, they can set up no greater claim to it because found on its native element than they could to tame pigeons in the air, or to a domesticated deer on a mountain. And this would be true had plaintiffs not been actually on the ice, by themselves or their servants, at the time of the trespass, since they had staked out their claim and plowed a deep cut all around it. If the action of plaintiffs in staking off this ice interfered in any degree with the common right of using the stream, their possession must be held, undoubtedly, to be subservient to the public use. But that is not pretended to have been the case; and defendants did not interfere to abate an alleged nuisance, but to appropriate another man's goods. The staking out of this ice interfered with no purpose of business or pleasure. To use the language of Judge Nelson in a somewhat similar case *(Fleet* v. *Hegeman,* 14 Wend. 46), "the case presents a deliberate and wanton violation of property acquired by the industry and care of another, under pretext of exercising a right in common, which defendants must have known to be fruitless." (Defendants appropriated this ice, apparently, on the theory that it was common property and

free to all, and to be appropriated specially by none.) "We certainly should have regretted if the law had given countenance to such depredations, and we are rejoiced to be able to declare them a gross violation of law — as they are of the first principles of justice."

Plaintiffs had sufficient property in this ice to enable them to maintain trespass. Possession is sufficient to enable the possessor to maintain trespass. Proof of actual possession by the plaintiff at the time of the trespass, in all cases, suffices to maintain the action against a mere wrongdoer, a naked trespasser who shows no title.

The judgment of the Circuit Court is reversed and the cause remanded. The other judges concur.