Theodore Newton SNEED (Plaintiff),
Appellant,

v.

Lawrence WEBER, Irene Weber and Carl
Weber (Defendants), Respondents.

No. 29714.

St. Louis Court of Appeals.

Missouri.

Dec. 3, 1957.

Motion for Rehearing or to Transfer to
Supreme Court Denied Jan. 3, 1958.

682

Dearing, Richeson & Weier, Samuel Richeson, Hillsboro, for appellant.

Robert V. Niedner, Niedner & Niedner, St. Charles, for respondents.

RUDDY, Presiding Judge.

This is a suit brought by plaintiff to enjoin and restrain the defendants from maintaining a pontoon bridge over the waters of Weber Lake in St. Charles County, Missouri, and to require said defendants to remove said pontoon bridge from the waters of said lake. From an adverse decree plaintiff appeals. We shall refer to the parties as plaintiff and defendants.

The evidence shows that plaintiff is the owner of approximately 75 acres of land in St. Charles County which he purchased about 13 months before the filing of the instant suit. According to plaintiff's testimony his property is bounded on the south by a county road. The property then runs northwardly from that road toward the Mississippi River and the main part of plaintiff's land is bounded on the north by the property of the defendants, Lawrence Weber and Irene Weber, his wife. Plaintiff's property is separated from the main body of the Mississppi River, sometimes referred to in the testimony as Alton Lake, by the property owned by the aforementioned defendants. However, the evidence does show that plaintiff has a small frontage on the Mississippi River, which he estimated to be 100 feet in length. Defendant, Lawrence Weber, testified that this frontage is at the mouth of Weber Lake where it meets the Mississippi River and is actually a finger, as he described it, of the lower part of Weber Lake.

A substantial part of the northern boundary of the land owned by defendants, Lawrence Weber and Irene Weber, his wife, is bounded by the Mississippi River. It seems from the testimony that the Mississippi River at this point flows eastwardly. As stated before, plaintiff's property is separated from the Mississippi River by the property of these defendants. Defendant, Lawrence Weber, has lived on this property since 1903.

In the course of the testimony frequent reference was made by some of the witnesses to a body of water known as Marais

Temps Clair Lake, which was described as more of a marsh land than a lake and only took on the appearance of a lake during rainy seasons when water would gather in the lower part of this so-called lake. This part of the lake, according to the testimony, was in the general area of the south end of plaintiff's land and may have included a part of said land. During the dry season weeds and marsh grass were the predominant growth, although one witness testified that part of this lake during the dry season was devoted to cultivated crops.

It is further shown by the evidence that many years ago, as early as 1903, someone sought to reclaim some of the area covered by the Marais Temps Clair Lake and dug and dragged a channel to the Mississippi River, at the same time taking advantage of natural low terrain to effect a drainage ditch to the river. This drainage ditch was variously referred to by the witnesses as a channel, a drainage ditch and a cove. We shall refer to it as the drainage ditch. This drainage ditch began at the county road, which was the south boundary of plaintiff's property and ran through plaintiff's property for approximately 1,400 feet and then entered the property of defendants, Lawrence Weber and Irene Weber. From there its course led to the Mississippi River. Prior to the erection of the Alton Dam across the Mississippi River, during the rainy seasons water would run through this drainage ditch into the Mississippi River. However, during most of the time the drainage ditch was dry and some of the witnesses testified that it had water in it only two months of the year. On occasions when the Missouri River would overflow its banks some of the overflow would find its way into this drainage ditch and thence to the Mississippi River.

In 1908 the father of defendant Lawrence Weber built a concrete dam across the drainage ditch and formed a body of water known as Weber Lake. The dam was built in such a manner as to permit people to walk across it from one side of the lake to the other. The lake was formed to attract fishermen and the dam was built in this manner to accommodate the fishermen. No part of this lake was on or touched plaintiff's property. In order to travel from one side of Weber Lake to the other it would have to be by boat or by crossing on the surface of the dam. There was no land connection. The water that formed the lake came from the drainage ditch and the surface surrounding the lake. Prior to the erection of the Alton Dam across the Mississippi River, there was no water connection between Weber Lake and the Mississippi River, except during flood stages of the river and sometimes during the rainy seasons of the year. During normal stages of both bodies of water there was no connection. The distance from the dam to the river was several hundred feet and according to one witness this area "was all growed up in brush and trees." No boat of any kind could go from the river into Weber Lake. The lake was about 8 or 9 feet above the normal stage of the river.

This lake was wholly within the property of defendants, Lawrence Weber and Irene Weber, except that a part of it was within the property of an adjoining owner. However, as heretofore stated, no part of the lake was on the property of the plaintiff.

In the year 1920 defendant, Lawrence Weber, erected another dam between the old dam and the Mississippi River and within about 40 feet of the river. The area between the dams was cleared of trees and brush and the land was excavated to a depth of 10 to 12 feet. The erection of the new dam and the excavation of the soil between the dams caused a second and smaller lake to form between the old lake and the river. According to the testimony, the cost of excavating the land for the new lake was twelve to fifteen hundred dollars. The person who excavated the land for the smaller lake testified that a big pipe had been placed in the dam holding the big lake and this permitted water to run from the big lake into the smaller lake. He also testified

that the overflow, if any, from the smaller lake would drain into the Mississippi River.

Defendant, Lawrence Weber, testified that after the small lake was built and before the Alton Dam was erected he had dug an opening between the second dam and the Mississippi River. In the course of this operation it was necessary to remove some of the timber in this area. This opening permitted water to drain from the smaller lake into the river.

The witness who testified that he excavated the land for the small lake, when asked if there would have been any water in the drainage ditch if the first dam had not been erected, answered, without objection, "There might have been a little mud in there but not any water to speak of."

Defendant, Carl Weber, is the brother of defendant, Lawrence Weber. The two brothers are engaged in operating a fishing resort and recreational area on the two lakes and the surrounding property owned by Lawrence Weber and Irene Weber. On the premises are 80 to 100 picnic tables, toilet facilities and buildings where merchandise is sold. Persons who use the fishing and recreational facilities must pay a fee. Operating this fishing and recreational resort has been the principal occupation of Lawrence Weber and Carl Weber. Approximately 80 to 90 acres of the Weber property is devoted to this enterprise.

During the period between the years 1938 and 1942 the United States Government erected a dam across the Mississippi River at Alton, Illinois, which is known as the Alton Dam.

On September 28, 1942, the United States of America by a judgment in the United States District Court acquired a perpetual right and easement to overflow the land of the defendants, as well as other lands affected by the erection of the Alton Dam. Under this judgment the United States also acquired the right to remove and dispose of all timber and other natural and artificial obstructions which

shall at any time and in any manner interfere with the use of said land for navigation purposes, together with the right to enter upon the said land for any of the aforesaid purposes. It should be observed at this point that there is no testimony in the record indicating that the United States has exercised the right to remove and dispose of timber or other natural or artificial obstructions. Nothing has been done by the United States to adapt the land covered by the flowage easement to navigation purposes. Lawrence Weber testified that the flowage easement included all of the drainage ditch, the two lakes and the channel from the small lake to the river.

The evidence shows that the concrete dam across Weber Lake was intact at the time the Alton Dam was erected and that patrons of the resort could and did walk across the concrete dam from one side of Weber Lake to the other.

Subsequent to the erection of the Alton Dam, the waters of the Mississippi River, held back by the dam, formed a body of water referred to by the witnesses as Alton Lake. When Alton Lake reached its normal level it joined the waters of Weber Lake and caused the water to back into the drainage ditch on plaintiff's land all the way to the county road. The effect of the formation of Alton Lake and its joinder with Weber Lake was to deepen the water of Weber Lake and to cause water to back into the drainage ditch, which usually had been dry most of the time. It also provided a water connection between the lower end of Weber Lake and the Mississippi River.

After Alton Lake was formed the minimum depth of the water in the drainage ditch was 4 feet with as much as 10 feet of water in some places. Plaintiff testified that the drainage ditch was 50 to 60 feet in width. He also testified that Weber Lake, after the formation of Alton Lake, was 10 feet in depth and in some places it was deeper. Plaintiff also testified that

the water in the area of the concrete dam across Weber Lake was 8 feet deep. In connection with his testimony about the depth of Weber Lake and the outlet between Weber Lake and the Alton Lake plaintiff was asked, "And did you find any place where the depth in that place was less than four feet?" and he answered, "Well, naturally, where obstructions exist it is not that deep." He further testified that there are a few trees and stumps at the mouth of Weber Lake where it flows into the Mississippi River (Alton Lake) but that they do not interfere with the operation of a boat.

One of the witnesses for the defendants testified that he operated a marine supply and boat store and was familiar with the vicinity of the Mississippi River where it joins Weber Lake, having had boats on the river for many years. He further testified that it was possible to navigate a small boat from the Alton Lake into Weber Lake if you do not care what happens to the bottom of the boat. He said before Alton Lake was established, the wooded area extended across what is now the mouth of Weber Lake and after the water level was raised some of the trees died, leaving stumps some of which extend above the water, while others are just below the surface of the water. He had operated a boat in this area and struck some of the stumps.

Another bit of significant testimony given by the defendant Lawrence Weber was that if the second lake had not been dug all the trees when removed would still be there and that there would be only a foot and one-half of water in that area at this time.

Defendants' Exhibit D was a photograph of the area at the mouth of Weber Lake where it joins the river. This photograph shows dead trees and stumps across the entrance to Weber Lake. This same condition is demonstrated to some extent by Plaintiff's Exhibit 9.

Beginning in the year 1945 and thereafter a series of floods caused by the Missouri River overflowing its banks washed away a part of the concrete dam, together with some of the land on each end of the dam. Thereafter, the defendants built pontoon extensions from the remaining part of the concrete dam to the adjacent land. These pontoon extensions were made of barrels and framework placed in the water. The part of the concrete dam that remains projects above the surface of the water. The record does not indicate how far above the surface of the water the dam extends, but Defendants' Exhibit 4 indicates that enough of the dam extends above the water to make it impassable for boats where the dam remains. The pontoon extensions were built to enable fishermen who patronized defendants' place to walk from one side of the lake to the other.

About five years before the trial of this case the defendants ceased using the concrete dam as a walkway across the lake. They built the pontoon bridge which plaintiff seeks to have removed. This pontoon bridge extends from one bank of the lake to the other and is used by the fishermen to walk from one side of the lake to the other. Both ends of the pontoon bridge are on defendants' property. It is undisputed that this pontoon bridge is an effective barrier to boats and prevents the passage of any boat between plaintiff's property and Alton Lake. Plaintiff admitted he knew the pontoon bridge was there at the time he purchased his property. This bridge is being maintained by the defendants. When defendant Lawrence Weber was asked if the pontoon bridge was not maintained in order to keep out boats, he answered: "The reason we put the pontoon bridge in there, we were always using the dam to cross on and the river washed that out and that is the reason we put the pontoon bridge in." He further testified that defendants do not permit any boats to be pulled over the pontoon bridge. The pontoon bridge is approximately 200 feet south of the con-

crete dam. The evidence shows that since about 1908 there has been either a concrete dam used as a bridge or a pontoon bridge across Weber Lake at all times.

Plaintiff testified that if the pontoon bridge was removed a boat could be operated from his property to Alton Lake and that on several occasions he operated an aluminum boat equipped with a Mercury motor between his property and Alton Lake. On these occasions he pulled the boat over the pontoon bridge. On one of these occasions he admitted that persons fishing in Weber Lake claimed that he destroyed their fishing lines with his boat.

It is the intention of plaintiff, if the pontoon bridge is removed, to build and operate a boat harbor in the drainage ditch within his property and to rent boats to be operated on Alton Lake. He testified that he intends to invite as many boat owners to use his proposed harbor facilities as space would accommodate.

Defendants' evidence shows that motor boats plying the waters of Weber Lake would destroy the fishing business operated by defendants, pointing out that persons who fish do not want motor boats disturbing the water. One of the witnesses for defendants, heretofore referred to as the operator of a marine supply and boat store, testified that the motors on motor boats use gasoline and oil, especially the small outboard motors, which use a half pint of pure oil to each gallon of gasoline, and that some of this oil is projected under the water through the exhaust from the motor. It was his opinion that in a small lake, the size of Weber Lake, the oil would contaminate the water and place a "microscopic film over the entire lake which would affect the fish." He also testified that the action of the propellers on the boats would affect the fish and that in a few months no one would ever catch fish in Weber Lake. He pointed out that commercial fishermen do not fish on Saturdays or Sundays on the Alton Lake because of the boat activity on this lake and that this is so even though

that body of water is a mile wide and 40 miles long. Plaintiff in his testimony admitted that motor boats plying the waters of Weber Lake would interfere with fishing.

Plaintiff admitted there was nothing to prevent him from dredging a ditch or channel through his property from the frontage he owns at the mouth of Weber Lake where it meets Alton Lake to the drainage ditch where he plans to build the boat harbor. If this channel was constructed boats could operate from the proposed boat harbor to Alton Lake and they would not have to use Weber Lake. Plaintiff further testified that such a channel "would cost a good deal of money" and that it would be much cheaper to run the boats over Weber Lake because "that excavation is already there."

At the time the trial court filed its decree in this case it also filed its "Findings of Fact and Grounds for Decision." We will not attempt to set out all the findings of fact made by the court, but will recite only such as we deem necessary. Among other facts the court found that defendants had excavated a large area of land near the Mississippi River and had placed a dam across the lower end of the drainage ditch; that the drainage ditch and Weber Lake were then neither navigable in fact nor in law; that when Alton Lake was formed the top of the concrete dam was above the water level; that the water occupying the former beds of the drainage ditch and Weber Lake was of sufficient depth to permit non-commercial watercraft to be sailed from the main body of the Mississippi River through Weber Lake and the drainage ditch to plaintiff's land and that this new body of water, *except for the maintenance of defendants' pontoon bridge*, was navigable in fact; that before the Mississippi River joined the water of Weber Lake that said lake "was then a private body of water, in which neither the public, nor plaintiff, had any interest."

The court then pointed out in its findings of fact that plaintiff's theory of recovery

was limited to Weber Lake having become a navigable stream or public highway by virtue of its union with another public highway, the Mississippi River. The court then further found that Weber Lake did not become navigable in fact because its waters were still separated in a large measure from the Mississippi River and that defendants' dam barred the access of river boats from the river to the lake and that Weber Lake was not navigable in fact and retained its status as a private artificial lake. In its final finding the court said, "Accordingly, the Court finds that Weber Lake is not and has never been navigable in fact because it has at all times been separated in a physical navigable sense from the Mississippi River. Being non-navigable in fact, it is of course non-navigable in law. The defendants' maintenance of the pontoon bridge is therefore proper * * *."

■ In an equity case, such as the instant case, we are not bound by the trial court's findings. However, where witnesses testify orally on questions of fact, the appellate court will defer somewhat to the findings of the trial court because the opportunities of the judge of the trial court to see and hear the witnesses on the stand and to judge of the probable truth or falsity of the evidence are superior to the opportunities of this court. McKinney v. Northcutt, 114 Mo.App. 146, loc. cit. 153, 89 S.W. 351, loc. cit. 353.

The only relevant evidence wherein there seemed to be conflict was that concerning the presence of tree stumps at the mouth of Weber Lake where it joins with the waters of Alton Lake. Some of the witnesses differed on the ability of a person to navigate a boat through this area. However, our view of the facts will not permit us to differ substantially from the trial court's findings of fact.

The first point asserted by plaintiff is that the trial court erred in its findings of fact and should have found that the water in the drainage ditch and in the lakes on defendants' property became a part of the Mississippi River after the Alton Dam was erected and that plaintiff, as well as the public, acquired the right to use the entire body of water for purposes of boating, bathing, fishing and navigation. He also asserts that the waters on the land of plaintiff and defendants are navigable in fact and in law. He makes the further point that the trial court erred in finding that the waters of Weber Lake were substantially separated from Alton Lake by the concrete dam and in finding that Weber Lake retained its status as a private artificial lake. These points have substantially the same basis and we shall treat them as one in the following discussion.

■ Plaintiff in his petition alleges that under and by virtue of the judgment in the United States District Court, which gave to the United States a perpetual right and easement to overflow the land of the defendants and the right to remove all obstructions that may interfere with the use of the land for navigation purposes, the waters formed on plaintiff's and defendants' land by the building of Alton Dam became and now are navigable waters of the United States and the State of Missouri. Plaintiff makes some mention of this contention in his brief and during the trial seemed to emphasize this theory. This easement obtained by the United States and the right thereunder to remove obstructions was an exercise of its paramount authority to control navigation and regulate commerce. That the Mississippi River is a navigable stream and important to navigation and the regulation of commerce is conceded by the parties. However, the United States has not exercised the right to remove obstructions and we doubt that this right will ever be exercised. It is difficult to visualize the present obstructions, natural or artificial, ever becoming obstructions to navigation on the Mississippi River. Whether or not this right is ever exercised by the United States, the right to remove obstructions can never inure to the benefit of plaintiff or any other member of the public. This right flows to the United

States alone and the mere existence of the right to remove obstructions at some time in the future does not make the water navigable now. So long as these obstructions do not, in the view of the United States or the State of Missouri, interfere with the navigability of the Mississippi River, no individual has cause of complaint. It is for the United States, and not for the individual, to say whether its interest is being served properly in this connection. Bolsa Land Co. v. Burdick, 151 Cal. 254, 90 P. 532, 12 L.R.A.,N.S., 275. Plaintiff cannot claim any benefit from this right given to the United States of America or any other right that may flow from the easement acquired and plaintiff's contention that the judgment of the United States District Court made the waters in question navigable is ruled against him.

At the trial in the lower court counsel for plaintiff objected to evidence of matters concerning Weber Lake prior to the construction of the Alton Dam, contending it was immaterial. He conceded then and does so in his brief, that plaintiff's case depends on whether or not the formation of Alton Lake and the joining of the waters of Alton Lake and Weber Lake made Weber Lake a navigable body of water within the meaning of the law. This concession by plaintiff admits that prior to the formation of Alton Lake, the drainage ditch and the body of water known as Weber Lake were not navigable in fact within the meaning of the law and, therefore, Weber Lake was a private body of water in which plaintiff had no interest. Plaintiff in his brief makes the further contention that Weber Lake, even though not navigable, is a public highway and, therefore, is open to the public.

Did the erection of the Alton Dam and the formation of Alton Lake and its consequences make Weber Lake a body of water navigable in fact within the meaning of the law? We do not think so.

At the outset we think it necessary to clarify a misunderstanding of plaintiff that threads its way throughout his brief. Plaintiff constantly refers to the water in the drainage ditch and in Weber Lake as an. arm of the Mississippi River. We do not subscribe to this description. In our opinion it is no more a part of the Mississippi River than is any other ditch, creek, or river that flows into that river. It must be acknowledged by plaintiff that the water in Weber Lake, before the erection of the Alton Dam, was much higher than the level of the water in the Mississippi River. In our view of the evidence the body of water under inquiry would not exist today, at least not to the extent it does, if it were not for the previous excavations that served to form the body of water known as Weber Lake. The evidence shows that at the time the second lake was formed ground was excavated to a depth of 10 to 12 feet. Plaintiff testified that the depth of the water at the concrete dam is 8 feet. This would indicate that if this ground had not been excavated the water of the Mississippi River, after the Alton Lake was formed, would not have joined the water of the first of the lakes formed on defendants' land.

The rule to be applied in this state in determining whether or not a body of water is navigable is to be found in the case of Elder v. Delcour, 364 Mo. 835, 269 S.W.2d 17, loc. cit. 22, 47 A.L.R.2d 370, where the Supreme Court, quoting from the case of Slovensky v. O'Reilly, Mo., 233 S.W. 478, 481, said:

" 'The test of navigability of a river, as stated by the Supreme Court of the United States, is that those rivers are navigable in law when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. Another test is whether, in its ordinary state, a stream or body of water has capacity and suitability for the usual purposes of navigation, ascending or descending, by vessels such as are employed in the ordinary pur-

poses of commerce, whether foreign or inland, and whether steam or sail vessels.' There are cases which call rafting logs commerce upon the stream, and broaden the view of the foregoing rule as to navigable streams. In Missouri, however, we have held to the more rigid rule, and with some aggressiveness."

In the Elder v. Delcour case, supra, the Supreme Court applied the aforesaid test to the Meramec River where it flows through Dent County and found that it was a "non-navigable river" at the point in question. This holding was made by the court despite the fact that it was admitted that the river where it crossed the appellant's property was navigable in fact by canoes, rowboats and other small floating craft of similar size and nature.

 It should be observed at this point that whether or not this body of water is navigable is a question of fact and the burden of proving this rests upon the plaintiff who asserts that it is navigable. There is no evidence that the body of water in question was ever used by vessels such as are employed in the ordinary purposes of commerce or that this body of water has the capacity or suitability for such purposes. Mere depth of water, without proof of its suitability to the ordinary purposes of commerce, will not render a watercourse navigable in the legal sense, nor will the fact that it is of sufficient depth to float small boats. Leovy v. United States, 177 U.S. 621, 20 S.Ct. 797, 44 L. Ed. 914; Gratz v. McKee, 8 Cir., 270 F. 713, 23 A.L.R. 1393; Id., 260 U.S. 127, 43 S.Ct. 16, 67 L.Ed. 167; United States v. Ross, D.C., 74 F.Supp. 6; Bolsa Land Co. v. Burdick, supra; Proctor v. Sim, 134 Wash. 606, 236 P. 114; State, by Burnquist v. Bollenbach, 241 Minn. 103, 63 N. W.2d 278; Harrison v. Fite, 8 Cir., 148 F. 781. To be navigable under the Missouri rule it must be capable of floating vessels or boats such as are used in the customary modes of travel in pursuit of commerce. It

is insufficient to show that a small boat may be navigated through a tortuous course. To declare the drainage ditch and Weber Lake navigable waters would be to turn a rule intended for the benefit of the public into an instrument of serious detriment to individuals, if not of actual private oppression. Griffith v. Holman, 23 Wash. 347, 63 P. 239, 54 L.R.A. 178. Also, if we were to declare Weber Lake and the drainage ditch navigable waters then there would scarcely be a creek or similar body of water, natural or artificial, in this state that would not be navigable under law.

The case of United States v. Ross, supra, is analogous to the instant case. In that case the defendant was charged with operating a motorboat in a reckless and negligent manner so as to endanger the lives of divers persons. The government conceded that unless the boat operated by the defendant was at the time it sunk operated on navigable waters of the United States, that there was no foundation on which to rest its case. The facts are these: A drainage district built a levee along the west side of the Mississippi River. In the building of the levee soil was taken from the land between the levee and the river leaving a "borrow pit" between the levee and the river. The pit paralleled the river for several miles and varied in width from 50 feet to 200 feet and in distance from the river from 10 feet to 100 feet. There were two openings from the pit to the river. These openings permitted a motorboat to pass from the pit to the river. The water in the pit was 6 or 7 feet at maximum depth and the openings at normal stage of the river had a depth of about 3 feet. In the borrow pit was a boat dock. The court in its opinion pointed out that a portion of the borrow pit north of the boat dock was not capable of use by motorboat at pool stage by reason of the presence of stumps and debris and then said:

"To hold that the borrow pit, under the admitted facts, is navigable water of the United States would be to stretch the term to include every body

of water, natural or artificial, which has any character or connection with a navigable stream through which a small boat can be pushed by oar or pole. We know of no authority to sustain such a holding." 74 F.Supp. loc. cit. 8.

Nor have we found such authority. To the same effect as the Ross case, supra, is the holding in Leovy v. United States, supra, where it was contended that a landowner had no right to place a dam across a crevasse caused by an overflow of the Mississippi River. The Supreme Court of the United States held this body of water was not navigable in fact in the face of evidence that small luggers or yawls used by fishermen went through the pass before the dam was built.

The evidence in the instant case shows the presence of tree stumps at the point where Weber Lake joins the Mississippi River. This is shown by exhibits and the testimony of defendants' witnesses. It is true plaintiff testified he navigated a boat through this area but, as we said before, it is insufficient to show that a small boat may be navigated through a tortuous course with extreme dexterity. Such a course does not offer a proper channel for navigation purposes. United States v. Ross, supra; State v. Bollenbach, supra; Harrison v. Fite, supra.

■ Another reason exists for holding this body of water non-navigable. It is well established law that a stream must be navigable in its natural state, unaided by artificial means or devices. Waters which can be made floatable only by artificial means are not regarded as navigable or as public highways. McKinney v. Northcutt, supra; Griffith v. Holman, supra; 56 Am.Jur., Waters, § 211, p. 673. The drainage ditch and Weber Lake are not naturally formed bodies of water. Both the ditch and the lake are the result of excavations by the defendants and others and the lake was formed by the erection of a dam. A major portion of the concrete dam remains.

As we indicated before, the body of water in question would not be there today if it were not for the artificial means. The dam itself forms an effective barrier to practical navigation.

■ Other reasons could be given to show that the drainage ditch and Weber Lake are non-navigable in fact and in law, but stating them would unnecessarily extend this opinion. What we have said amply demonstrates the need for sustaining the trial court's finding that this body of water is not navigable in fact and, therefore, is not navigable in law. The contention of plaintiff that the drainage ditch and Weber Lake is navigable is overruled.

■ The next and final contention made by plaintiff is that Weber Lake, even though it is not navigable, is a public highway and, therefore, is open to the public. Plaintiff cites a number of cases he contends support his position. No useful purpose would be served in setting out a minute analysis of these cases. The case of Hickey v. Hazard, 3 Mo.App. 480, involves the Mississippi River and the case of Benson v. Morrow, 61 Mo. 345, involves the Missouri River. In both of those cases the rivers are unquestionably navigable rivers which make them public highways. We found Weber Lake to be non-navigable. In the cases of McKinney v. Northcutt, supra, and Northcut v. John O. Long Tie and Lumber Company, 187 Mo.App. 386, 173 S. W. 15, the court found Indian Creek "navigable * * * within the meaning of the law" for the purpose of transporting logs to market and limited the public use of the creek to that purpose. [114 Mo. App. 146, 89 S.W. 353.] The evidence in one of the cases showed that this stream had been used for this purpose for many years. No such evidence faces us in the instant case. Significant to the instant case is the statement made by the court in the McKinney case as follows: "Waters which can be made floatable only by artificial means are not regarded as public highways." The evidence in the case of

State v. Wright, 201 Mo.App. 92, 208 S.W. 149, showed that the Limes Tie & Timber Company was engaged in floating ties and timber down the Current River and had been so engaged for some time and was doing an extensive business in this connection. Again we must state, there is no such evidence in plaintiff's case. The case of Wright Lumber Company v. Ripley County, 270 Mo. 121, 192 S.W. 996, has no relationship to the issues presented in this appeal. It involved ownership of an island in the Current River.

Among the cases cited by plaintiff to support his contention is Elder v. Delcour, supra. In that case, as we have stated, the Supreme Court found that the Meramec River at the point in question was not navigable. However, the court did find that the water area of the river involved in the dispute was a public highway, subject to an easement for public travel by boat and wading. The weakness of plaintiff's reliance on this case is that it is based on the contention that Weber Lake is now a part of the Mississippi River. We found against this contention. In the Elder v. Delcour case the court summarized the basis of its holding in the following language:

"In view of the admitted facts concerning the capacity, suitability and use of the river at the place in question for public and commercial purposes, the provisions of the several Acts of Congress and the Constitutions mentioned and the well established applicable case law of this state, we must and do hold that the waters of the Meramec River are public waters and the submerged area of its channel over and across appellant's farm is a public highway for travel * * *." 269 S.W.2d loc. cit. 26.

In the aforesaid case the court was dealing with a river that existed prior to the time the title to the land involved passed by grant from the United States to a citizen of this state. In commenting on this matter the court said that such a "grant must be interpreted, understood, limited and restrained, according to the law of the country, *in force at the time when the grant was made.*" The court then analyzed the Act of Congress providing for the government of the territory of Missouri and the subsequent Act authorizing the people of the Missouri territory to form a constitution and state government and for admission into the Union and the Constitutions of this state since its admission and then declared:

"Any title which appellant may have acquired to the bed of the river in question was necessarily subject to the applicable law in force at the time, and such applicable law may not be disregarded in determining whether the Meramec River at the place in question, is in fact a public highway and open for public travel by boat and wading." 269 S.W.2d loc. cit. 24.

At the time Weber Lake was built the title to the land was apparently in the father of Lawrence Weber. The only logical inference that may be drawn from the evidence is that there was no body of water on the Weber land prior to the time of building Weber Lake that was subject to the applicable law concerning public waters. Thus, the instant case is not parallel to the aforesaid case in the respect discussed. Nor is it parallel in any other respect. In the case of Elder v. Delcour, supra, it was admitted that the Meramec River "was used for the purpose of floating logs and timber at the point of its crossing of the Delcour land and for many miles up the stream from this point." The court took judicial notice that the Meramec River has long been known as a very popular fishing stream. It was these facts concerning the size and the use of the river and the law in force at the time the original grant was made that formed the basis of the holding that the Meramec River at the point in question was a public highway. We do not have such facts or applicable law in this appeal.

692

Plaintiff cites Greisinger v. Klinhardt, 321 Mo. 186, 9 S.W.2d 978, and Mueller v. Klinhart, Mo.App., 167 S.W.2d 670, as supporting authorities. These two cases involved the rights of adjacent proprietors to Lake Killarney. All the land covered by the lake was formerly the property of the Arcadia Country Club. The Arcadia Country Club constructed across a creek on the property a concrete dam 426 feet long and 30 feet high. This caused the formation of a lake that covered about 175 acres. The court applied the following principle of law: "Where the owner of land has, by any artificial arrangement, effected an advantage for one portion, to the burdening of the other, *upon a severance of the ownership* the holders of the two portions take them respectively charged with the servitude and entitled to the benefit openly and visibly attached at the time of the conveyance of the portion first granted." 9 S.W.2d loc. cit. 980. Plaintiff in our case is not an adjacent proprietor to Weber Lake. We have found that no part of the lake is on plaintiff's property.

Plaintiff concedes that Weber Lake was not navigable and was not a public body of water prior to the formation of Alton Lake. We rule that the joining of the waters of Weber Lake with Alton Lake in the manner described did not change the essential nature and character of the former. Most of the concrete dam remains and we think the trial court was correct in finding that the former waters of Weber Lake were substantially separated from the waters of Alton Lake by the concrete dam.

If we had no rules of law to guide us, elementary justice would require a denial of plaintiff's plea. To permit plaintiff to use the private lake of defendants, built at considerable expense, for his own material gain would be a miscarriage of justice.

The findings of the trial court and its judgment and decree are affirmed.

MATTHES and ANDERSON, JJ. concur.