Henry J. LUESSE, (Plaintiff) Appellant,

v.

Lawrence WEBER, Irene Weber, his wife, and Carl Weber, (Defendants) Respondents.

No. 30627.

St. Louis Court of Appeals.

Missouri.

Oct. 17, 1961.

Motion for Rehearing or to Transfer to Supreme Court Denied Nov. 15, 1961.

Samuel Richeson, Dearing, Richeson & Weier, Hillsboro, for appellant.

Robert V. Niedner, Niedner & Niedner, St. Charles, for respondents.

O. P. OWEN, Special Judge.

Plaintiff-appellant sought in his petition to enjoin and restrain defendants-respondents from maintaining a pontoon bridge across the waters of Weber Lake, for an order requiring the removal thereof, and for damages for depreciation of his land underlying a portion of Weber Lake by reason of the erection and maintenance of the pontoon bridge in the sum of $8,000.

Defendants set up the defense of limitation and laches. The parties will be referred to as plaintiff and defendants.

The trial court denied relief sought by plaintiff upon a finding that the plaintiff was precluded by acquiescence in the construction and maintenance of the barrier in Weber Lake and by limitation.

The same pontoon bridge was involved in a suit brought by Theodore Newton Sneed against these same defendants to enjoin and restrain defendants from maintaining the bridge and to require defendants to remove the bridge. That case was ruled adversely to plaintiff and on appeal to this court the judgment of the trial court was affirmed. Sneed v. Weber, Mo.App., 307 S.W.2d 681.

The opinion in the Sneed case is comprehensive and inclusive and in our view contains a statement of historical facts which pertain to this instant case. To avoid unnecessary repetition we adopt the statement in that case, supplementing it with such additional evidence as was adduced in the trial of this case.

Henry Luesse, plaintiff, testified his father acquired the Luesse tract, part of which underlies a portion of Weber Lake, in 1906, when plaintiff was about 15 years of age and that he has lived there since. At the time of moving there a natural lake was on the property. A drainage ditch ran from Marias Temps Claire about two miles into Weber Lake. At times one could go by rowboat from Weber Lake into the Mississippi River. Sometimes one would have to pull the boat through. About half the year a boat could go through without pushing. The concrete dam between Weber Lake and the Mississippi was put in raising the level of Weber Lake several feet around 1914 or 1915. Plaintiff's father helped put in the dam. This raised the water on the Luesse property. Following the erection of the dam plaintiff and his family used the entire surface of the lake. A steel boiler in the dam for overflow, through which plaintiff could almost walk at normal level, would have 6 or 8 inches of water in it, and at other times would be half full. This was 200 or 300 feet from the Mississippi. There were seasons when the waters of the Mississippi raised enough to cover the dam. Since the construction of Alton Dam the level of water in Weber Lake is 6 or 8 feet higher. The dam in Weber Lake is still there but the earthen construction at either end is gone. The earthen part was cut off at each end of the dam by high water before construction of Alton Dam. At this time about 1 foot of the dam extends above the water. The top of the boiler in the dam is about 2 feet below the top of the dam. Since the operation of Alton Dam the

water level varies about 1 foot by the opening and closing of gates. Excessive floods would cause greater variation. His father on occasions would use a boat to go to the Mississippi through Weber Lake. Sometimes he could row through and then again he could not. He never went through the boiler pipe in the dam. After the earthen works at the end of the concrete dam went out and after the building of Alton Dam, it was possible to go from the Mississippi up to the Luesse property at all seasons with no obstructions. The pontoon bridge was built about 200 feet south of the concrete dam after the building of Alton Dam, and this pontoon bridge prevents boats from moving from the Luesse property over Weber Lake to the Mississippi River and return. Plaintiff desires to have a boat dock on his property.

After the concrete dam was constructed at Weber Lake a fence consisting of piling and three wires was constructed by the Webers on the line of the Weber property to keep the Luesses from going over the Weber waters with a boat. Prior to 1920 when automobiles became prevalent the Webers didn't object to members of the Luesse family fishing wherever they wanted on the lake. The wire fence did not remain long as some fellow in a boat snipped the wires one night and they were never replaced. His father helped put in the boiler for overflow and plaintiff and his father worked there with a team and scraper. Neither plaintiff nor any member of his family made any effort to remove the posts or pilings nor objected to the fence. The fence was placed in the lake after the Luesses began to permit fishing in Weber Lake for a fee. Those who paid Luesses a fee for fishing were supposed to fish on that part of the lake on Luesse property, and Weber charged a fee for those who fished on the Weber property. This situation had existed since about 1920. Occasionally when someone who paid Luesse would get onto the Weber side he would be requested to go back and also someone who paid Weber and who got onto the

Luesse property would be ordered to go back to the Weber property. The pontoon bridge was put in after the Missouri River broke out over St. Charles County and down through Weber Lake and tore out everything. This was about 1951. That flood washed out on both sides of the dam and heavy planks were placed from the main shore to the concrete wall so people could walk across the concrete dam, and those planks prevented the passage of boats. But occasionally plaintiff and the Beilsmith boys would take a boat under the boards at the end of the dam. The building of the small concrete dam extended the area of Weber Lake over about 4 or 5 acres of the Luesse property.

Theodore Sneed, who had maintained the prior suit, testifying for plaintiff, identified photographs he made on September 19, 1955, which were offered in evidence. Most of the pictures were made from a boat, which for the purpose of some of the photographs, was pulled over the pontoon bridge by the witness. These photographs were taken first from the county road facing north and then progressively down the body of water into the Mississippi River. Witness measured the depth of the water in Weber Lake, which is 10 feet or deeper; at the pontoon bridge about 7 feet deep; and from the pontoon bridge to the main part of Alton Lake it runs 7 to 9 feet in depth. There are a few stumps in the water between Weber Lake and the main body of Alton Lake which do not interfere with navigation.

George Boschert, born and reared in the area, testified that during high water he brought a number of workmen over what was formerly Weber Lake to get them to Lambert Field to work at McDonnell Aircraft Corp. This was for a week or so in 1951. He took them from Portage des Sioux in a motor boat. The water then was about 12 feet higher than pool stage. The only other time he had a boat in that area was about 1908 before the concrete dam was built.

Vincent Connoyer, resident of Portage des Sioux since 1921, testified he went over the Weber Lake area during high water, the last time being during the last flood in 1951, when for 22 days he took groceries, passengers and mail to Luesses. He had driven his boat after the flood, when the pool was normal, around the concrete dam in Weber Lake on either side. At that time the bridge had been washed out by the flood. When the Missouri River came up the current was very strong, and then witness would travel above the Webers to get to Luesse's property, and after the water receded he would go up through Weber Lake. When the flood was at its height it was not practicable to travel through Weber Lake because of the current.

Hubert Jacobs of Portage des Sioux, testified that over a period of 2 weeks in 1943 or 1944 he traveled by boat during high water in going to and from high school daily. The only obstruction from the main body in Alton Lake up to the Weber Lake portion was the concrete dam which he had to go around when the water got back to pool level. He never rode a boat from the Mississippi River up to Weber Lake other than during a flood and that was because the road from Portage des Sioux to St. Charles was under water. The flood waters raised the level of the Mississippi at least 10 or 12 feet which was over the concrete dam in Weber Lake and way up over the stumps and trees between Weber Lake and the Mississippi.

Lawrence Weber, one of the defendants, testified that before Alton Dam was completed, at other than floodtime, there was no water connection between Weber Lake and the Mississippi River. The concrete dam at the lower end of Weber Lake was built by Weber's father around 1908. He remembers that Mr. Luesse, father of plaintiff, was around when the dam was built but he did not see Mr. Luesse do any work on it. At normal stage water would run only in a trickle between the dam and the Mississippi River. There were times when the river was up that one could get a boat from Weber Lake to the Mississippi River. He never saw anyone take a boat over the ditch between Weber Lake and the Mississippi River before the concrete dam was built. The building of the concrete dam deepened the water in the part of Weber Lake on the Luesse property, but it occupied only a very little more of the Luesse property because of the steep bank on the Luesse property. He recalls no fence between the Weber and the Luesse property before the dam was built. Both before and after construction of the concrete dam people who paid Luesse for the privilege of fishing were kept on the Luesse property and those who paid the Webers were kept on the Weber property. A fence was built about 1925 by driving pilings when there was ice on the lake and placing wire thereon. They had plenty of trouble with people cutting the wire. Witness does not remember the Luesses making objection to the fence. The fence was repaired but floodwaters made it impossible to keep the fence and it was washed out. The concrete dam was for the purpose of raising the level of Weber Lake and to enable the crossing for farm purposes and for people to cross over and go around the lake when fishing. The pontoon bridge was built when the flood waters washed out the ends of the dam. The floods did not damage the pontoon bridge because it could be pulled over to the side during a flood and replaced across the lake when the flood was over. During flood stage the water would be 10 to 12 feet higher than normal. No objection was made by the Webers to passage of boats from Portage des Sioux to the Luesse property when Highway 94 between Portage des Sioux and St. Charles was flooded. About 1930 a drag line was used to dig out from the concrete dam to within about 40 feet of the Mississippi River and another dam was placed there with a pipe for overflow. In 1934 the water started to get low and they pumped water into one lake and let it run into the other to keep the fish from dying. There has never been any commercial boat traffic in Weber Lake from 1903 to the present time. The flowage easement of the govern-

ment includes clubhouses, cottages, picnic tables, toilets, groves, trees and picnic areas. If motorboats are permitted the fishing would be affected. A crossing over Weber Lake has been maintained since 1908.

Louis Ostmann, a farmer and former contractor and excavator testified that in 1930 or 1931 he dug a lake between Weber Lake and the Mississippi River. There was before this time no water connection between Weber Lake and the river, it having been grown up in brush and trees. The new lake was dug to within 40 or 50 feet of the Mississippi by use of a drag line. Old Weber Lake was severel hundred feet from the river. The cost of the work done by witness was $1,200 or $1,500. There was no water in particular where he excavated. He dug a ditch between the newly excavated lake and the river in which to lay a pipe. He knows of no way a boat could have operated from the Mississippi to Weber Lake before Alton Dam was built.

Helmuth Dallmeyer, operator of a marine supply and boat store and general insurance business, residing in St. Charles, testified he has been acquainted with the Weber Lake area since 1928 or 1929. The ditch from Marias Temps Claire to Weber Lake did not always have water in it. When heavy rains came water covered thousands upon thousands of acres of land. The Webers have a fishing resort at Weber Lake and have a boat dock 500 yards or so upstream from Weber Lake which has no connection with Weber Lake. In the witness' opinion the use of motor boats on Weber Lake would contaminate the water because of microscopic film from motor exhaust which would affect the fish. If this occurred for a few months witness believes fishing on Weber Lake would be done with. A small outboard motor craft could go from Alton Lake into Weber Lake except for the pontoon bridge, but there are stumps which cannot be seen on photographs which make navigation difficult. Witness remembers the piling fence separating the Weber and Luesse property until the flood of 1947

or 1951. Witness and his father belonged to the old Weber Lake Club. During the floods he was Disaster Chairman of the Red Cross for St. Charles County. In 1951 the entire town of Portage was completely isolated and it was necessary to provide some method of getting food to the people and to get people to doctors.

Francis Rauch has been acquainted with Weber Lake since 1906 or 1908 when he was a boy. There was never a water connection between Weber Lake and the Mississippi River. He remembers the fence between the Weber's and Luesse's property which remained until Alton Dam was put in.

The finding of the chancellor, at the conclusion of the hearing of this case, is as follows:

"Plaintiff bases his right to recover under Count I upon two theories: First, upon rights growing out of his ownership of a portion of the land underlying Weber Lake, and secondly upon the theory that Weber Lake is a navigable stream. The two theories will be dealt with in inverse order.

"The facts here have been compared with those reported in Sneed v. Weber [Mo.App.], 307 S.W.2d 681. They differ only in two respects. Plaintiff points to a portion of that opinion at page 688 relative to a conclusion as to what the present level of Weber Lake would be if there had been no excavations, and then calls attention to testimony in this case tending to contradict that conclusion. However, that conclusion was not a necessary foundation of the rationale of the Court of Appeals in its finding that Weber Lake was not navigable. Hence, this new evidence does not warrant a different result. Next, there was additional evidence in this case concerning the use of the area by small boats during times of excessive floods. It does not follow from this that Weber Lake was navigable. Greisinger v. Klinhardt [Klinhart], 282 S.W. 473, 476. Accordingly, this Court

is bound by precedent to deny relief to plaintiff on the theory of navigable waters.

"The first of the series of Klinhardt [Klinhart] cases, Greisinger v. Klinhardt [Klinhart], 282 S.W. 473, is akin to the case at bar. There, a non-navigable natural body of water was dammed to form an artificial lake. The parties acquired title to portions of the lake, and plaintiff sought to establish a right to use the entire *surface*. The Court first expressed doubt that either owner had an exclusive right as to the waters over his own land, and then rather hesitantly held to the contrary, saying that in the absence of prescriptive rights or estoppel each owner had the exclusive right to the waters over his own portion of the land. Even the result was inconclusive, for the Court merely dismissed the petition, without prejudice. Then in the second Klinhardt case, Greisinger v. Klinhardt [321 Mo. 186], 9 S.W.2d 978, the Supreme Court squarely held, at l.c. 983, that each owner did have the right to use the entire surface of the lake 'the same as if it were a natural body of water.' The third Klinhardt case [Mueller v. Klinhart, Mo.], 164 S.W. 2d 928, involved an injunction by which the defendant was enjoined from maintaining a fence along the property line through the lake. Upon transfer to the Springfield Court of Appeals, 167 S.W. 2d 670, the injunction was affirmed. That Court interpreted the second case 9 S.W.2d 978, as holding that 'one whose property was covered by waters of an artificial lake, created by a predecessor in title of both defendant and plaintiff, is entitled to use all of such waters.'

"Applying these principles to the case at bar, it seems clear that upon the initial severance of the Morrison tract in 1865, the grantor and the grantee of the 'Luesse tract' each acquired an easement to use the entire surface of the lake as it then existed. This prevailed in 1908 when Charles Weber and Henry Luesse were the respective owners of the portions of the bed of the original lake. The enlargement of the lake by Weber's dam in 1908, with Luesse's knowledge and consent, would not lessen the easement of Luesse to the surface use of the lake.

Plaintiff relies upon this entire-surface easement as the basis for his prayer for injunctive relief to compel defendants to remove the pontoon bridge across the far end of Weber Lake. The defendants counter by pleading limitations and laches.

"The record is void of any previous claim of right by the Luesses to use any part of the lake lying over the Weber lands. To the contrary, it affirmatively appears that for at least thirty or forty years before this suit was filed each owner used only his own part of the lake's surface, and when the occasion arose, objected to such use by the licensees of the other. During most of this period there was a fence along the property line through the lake, built by the Webers, to which the Luesses never objected. The fence was damaged from time to time, and gradually disappeared, but the line was accepted by each owner as the boundary of his surface rights. Further, since the raise in the level of Weber Lake by the inundation of the Alton Lake in the mid 1940's, the Webers have maintained a barrier between Weber Lake and Alton Lake. Until 1951 or so this barrier was the concrete dam and its wooden approaches which served as the Weber's access to the other shore of the lake. Since damage to that structure by the 1951 flood, the barrier has been the pontoon bridge now in question, located 200 feet upstream from the concrete dam.

"Accordingly, it appears that for the past thirty years and more the plain-

tiff and his grantor have made no claim of right to any portion of the lake lying over the Weber land, and have acquiesced in Weber's claim of exclusive right to the use thereof. Further, it appears that for the past fifteen years the plaintiff has made no objection to defendants' obstructing the lower end of the lake and thereby denying plaintiff the possibility of access from the lake to Alton Lake.

"One of the maxims of equity is that equity aids the vigilant, not those who slumber on their rights. Here, plaintiff has acquiesced in defendants' exclusive use for many years. 'From acquiescence, the court may presume assent to the adverse right, and the consequent abandonment or waiver of the right sought to be enforced.' 30 C.J.S., Equity, 117, citing Dexter v. Macdonald, 95 S.W. 359, 196 Mo. 373, where the court said:

" 'Acquiescence or delay for a length of time after a man is in a situation to enforce a right, and with full knowledge of the fact, is, in equity, cogent evidence of a waiver and abandonment of the right. Lapse of time, when it does not operate as a positive or statutory bar, operates in equity as an evidence of assent, acquiescense, or waiver.'

"Not only is plaintiff's claim unpalatably stale, but it has tinge of avarice. He seeks now to taste the fruits of the defendants' labor and investment, in a way that would work an irreparable injury to the defendants. His plea does not appeal to the conscience of a chancellor.

"Further, it appears that the ten-year statute of limitations would bar plaintiff's recovery. Plaintiff cites the case of Frank Bros. v. Rose [Mo.], 301 S.W. 2d 806, to the effect that an easement by grant is not extinguished by 'mere non-user'. That case does so hold, but recognizes that such rule does not apply to situations where a grantee has *abandoned* the easement. See 28 C.J.S., Easements 60, where the rule is stated:

" 'Conversely, an easement acquired by grant may be extinguished by nonuser under circumstances indicating an intention to abandon extending over a period of time which would have been sufficient to create a prescriptive right to the easement, or even for a less period.'

And, see Eureka [Real Estate & Investment] Co. v. Southern R. E. Co. [355 Mo. 1199], 200 S.W.2nd 328(1–3). 'Abandonment' is laboriously defined in Re Clark's Estate [Mo.App.], 213 S.W.2d 645(2). It is composed of acts and intentions. Here, plaintiff acquired by grant an easement to use the 'Weber portion' of the lake. Then, for decades he not only failed to use that right, but denied Weber the reciprocal easement over the 'Luesse portion' of the lake. It follows that plaintiff has abandoned his easement for more than the statutory period."

The evidence established that although the Webers and the Luesses may have had the right to use the entire surface of Weber Lake, they did not so use it, and, in fact, each owner recognized the right of the other to the exclusive use of the water over his own land. The situation existed since the enlargement of Weber Lake by the construction of the concrete and earthenwork dam around 1908. And it furthermore appears that no question was raised about such recognition until the filing of the Sneed action in 1956 and at no time were any rights asserted by the Luesses against the Webers, claiming rights in the lake over the Weber property until the filing of the present action on October 24, 1958. Thus it appears that for some 50 years there was no disagreement or conflict between the riparian and underlying owners concerning the use of the lake.

There is nothing in the evidence adduced in the instant case which, in our

opinion, alters the factual situation presented in the Sneed case regarding navigability. We are, therefore, constrained to follow the Sneed case and hold that Weber Lake is not a public highway and is not a navigable body of water in fact or in law. The mere fact that on occasions during the high water due to the overflow of the Mississippi and the Missouri Rivers boats were operated to and from the Mississippi River channel to the Luesse property passing over Weber Lake without remonstrance from the Webers creates no vested rights or privileges on the waters of Weber Lake antagonistic to whatever rights the Webers may have enjoyed.

The testimony of plaintiff that plaintiff and his father aided in the construction of the concrete dam to enlarge Weber Lake in 1908, in our opinion, only tends to establish acquiescence by the Luesses in the establishment of the barrier between their land and the Mississippi River.

■ The testimony in the instant case differs from that offered in the Sneed case only in respect to a showing that on occasions during flooding of the Mississippi and Missouri Rivers, when roads in the area were under water, motorboats had operated over Weber Lake from Portage des Sioux to the Luesse property for the transportation of individuals, supplies, and the mail. Such occasional use is not such as to establish Weber Lake as a navigable body of water. Greisinger v. Klinhart, Mo.App., 282 S.W. 473; Elder v. Delcour, 364 Mo. 835, 269 S.W.2d 17, 47 A.L.R.2d 370; Sneed v. Weber, Mo.App., 307 S.W.2d 681.

■ Plaintiff here is owner of the land underlying the waters of Weber Lake not owned by Webers, and his position differs from that of plaintiff in the Sneed case, who was not owner of any ground lying under or adjoining Weber Lake. Except for the construction of the pontoon bridge after the earthenwork at both ends of the concrete dam had washed out following the 1951 flood the physical situation at Weber Lake, save for the raising of pool stage by the installation of Alton Dam, has remained the same since about 1908 with no disagreement as between the respective owners of the land beneath concerning the exclusive use by each, or their invitees or guests, of the waters above, generally for the purpose of fishing, until the filing of the instant lawsuit in 1958. Nor did the owners of the Luesse property at any time complain or object to the construction and maintenance by the Webers of a fence across the lake separating the properties. We believe that this very unusual situation demonstrates that the use to which Weber Lake has been put for these many years dispels all reason for enjoining the maintenance of the pontoon bridge which, as did the concrete dam and the earthenwork ends thereof, join lands of the defendants located on the east and west sides of Weber Lake. We believe the evidence demonstrates complete acquiescence by plaintiff in the exclusive use by defendants of all waters of the lake within the boundaries of the defendants' lands.

■ Acquiescence in an adverse right is an important element of laches. Where plaintiff has acquiesced for an unreasonable length of time in the assertion or operation of a right adverse to his own, equity will not enforce his claim. From acquiescence, the Court may presume assent to the adverse right, and the consequent abandonment or waiver of the right sought to be enforced. 30 C.J.S. Equity § 117, p. 539; Dexter v. Macdonald, 196 Mo. 373, 95 S.W. 359.

Being of the opinion that the plaintiff acquiesced in the exclusive use of the lake over the land of the Webers by the Webers and that such acquiescence bars him from asserting his right to injunctive relief by requiring the removal of the pontoon bridge erected by defendants, his claim for damages by reason of the maintenance of the pontoon bridge must likewise fail.

■ Plaintiff insists his rights to use the entire surface of Weber Lake arise from the fact that Weber Lake existed as a body of water at the time of and before separa-

tion of title from the common source in 1865 or 1868, and by reason thereof it was a right acquired by grant and not by prescription and that mere non-user will never bar the easement thus obtained. It does not appear from the record in this case that there was a body of water constituting a natural or artificial lake at the location at the time of separation of title from the common source. Plaintiff says a natural lake existed at the time his father acquired the property in 1906 which was connected by a ditch to Marias Temps Claire some two miles away. Reference is made in plaintiff's testimony to one Kincaid digging a ditch draining Marias Temps Claire into Weber Lake. The time of this ditching is not shown. A lake was shown to exist in 1903 by Lawrence Weber's testimony as well as by surveys made in the early 1900's. This is not sufficient to establish an easement by grant to plaintiff in all the waters of Weber Lake. At most he has an easement by implication which, in our opinion, has been barred by laches as well as limitation.

In an equity case, the appellate court is not bound by the trial court's findings. But the appellate court will defer somewhat to the rulings of the trial court where witnesses testify orally on questions of fact because of the opportunities of the trial court to see and hear the witnesses on the stand and to judge the testimony. McKinney v. Northcutt, 114 Mo.App. 146, 89 S.W. 351.

We are of the opinion that the findings of the trial court are correct and that they are grounded on proper equitable principles. This is not an action to maintain a right which plaintiff has claimed for years but it plainly appears that it is an attempt to subject Weber Lake to use as a passageway for motorboats proposed to be docked on plaintiff's property, a use which would destroy fishing, the very use to which the lake has been put for many years by both plaintiff and the defendants and their guests and invitees.

The lake was created as a fishing resort by the construction of the concrete dam and earthenwork ends by the industry and expense of defendants and their predecessors in title. To permit plaintiff to destroy the use to which Weber Lake has been put for many years for his own benefit would be a gross miscarriage of justice.

The findings of the trial court and its judgment and decree are affirmed.

ANDERSON, P. J., and WOLFE, J., concur.

RUDDY, J., not participating.